Stewart DAVIS, Jr., Appellant,

v.

Mark DYKMAN and Allstate Insurance Company, Appellees.

ALLSTATE INSURANCE COMPANY, Appellant,

v.

Mark DYKMAN, Appellee.

Nos. S–7523, S–7563.

Supreme Court of Alaska.

May 2, 1997.

Colleen J. Moore, Eide & Miller, P.C., Anchorage, for Stewart Davis, Jr.

Dennis M. Mestas, Law Offices of Dennis M. Mestas, P.C., Anchorage, and Michael Moody, Atkinson, Conway & Gagnon, Anchorage, for Mark Dykman.

Mark E. Wilkerson, Wilkerson & Associates, Anchorage, for Allstate Insurance Company.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, EASTAUGH and FABE, JJ.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

Appellants Stewart Davis, Jr. and Allstate Insurance Company argue that there was an enforceable settlement agreement that resolved personal injury tort claims asserted by Mark Dykman against Davis, and that the superior court erred in holding otherwise. We affirm.

## II. FACTS AND PROCEEDINGS

In April 1993 Stewart Davis, Jr. lost control of the car he was driving. It left the road and overturned. Mark Dykman, a passenger in the car, suffered head injuries and a spinal cord injury that rendered him a quadriplegic.

Allstate Insurance Company had issued a liability insurance policy to Dykman's father, who owned the car. The policy covered Davis as a permissive user of the car. It provided liability coverage in the stated amount of $100,000, plus supplementary payments for attorney's fees awarded under Alaska Civil Rule 82 and interest.[1] The policy also provided medical payment coverage in the amount of $50,000.

In September 1993 Allstate offered to settle Dykman's personal injury claim against Davis for the face amount of the policy ($100,000) plus interest and attorney's fees on that amount. The offer included Rule 82 attorney's fees based on the contested with trial schedule. Alaska R.Civ.P. 82(b)(1).[2]

On December 14, 1993, in a letter to Allstate's representative, Dykman rejected Allstate's offer on the ground that the policy's attorney's fees limitation clause was likely invalid, citing 3 Alaska Administrative Code (AAC) 29.010(d) (repealed July 1, 1996).[3] Dykman also asserted that Allstate probably was liable for "unlimited" attorney's fees because the supplemental payments clause did not include the disclosure and warning required by 3 AAC 29.010(d). Dykman

---

1. With respect to attorney's fees Allstate's supplemental payments clause states:

    2. Court Costs for Defense. We will also pay the prevailing parties [sic] attorney's fees awarded against you by an Alaskan court. Our liability for such attorney's fees is limited to the amount allowed by Alaska Civil Rule 82(b)(1) for a contested case which involves a liability coverage payment equal to our limit of liability. Any payment made for prevailing parties [sic] attorney's fees will be in addition to our limit of liability for this coverage.

    3. Interest Accruing on Damages Awarded. We will pay this interest only until we have paid offered, or deposited in court the amount for which we are liable under this policy. We will only pay interest on damages not exceeding our limits of liability.

2. Alaska Rule 82(b)(1) states:

    The court shall adhere to the following schedule in fixing the award of attorney's fees to a party recovering a money judgment in a case:

| Judgment and, if awarded, Prejudgment Interest | | Contested With Trial | Contested Without Trial | Non-Contested |
|---|---|---|---|---|
| First | $ 25,000 | 20% | 18% | 10% |
| Next | $ 75,000 | 10% | 8% | 3% |
| Next | $400,000 | 10% | 6% | 2% |
| Over | $500,000 | 10% | 2% | 1% |

3. 3 AAC 29.010(d) stated:

    An insurer limiting coverage as permitted in (a) of this section must clearly disclose to its insured the limitation and the insured's potential liability for attorney's fees where judgment exceeds the liability limits of the policy.

claimed unlimited attorney's fees based upon a favorable jury damage verdict, which he projected would be between $15 million and $30 million. Dykman concluded the letter by stating:

Therefore, we hereby offer to settle this case for Allstate's policy limits, based on unlimited Rule 82 on an anticipated jury verdict. Please inform us promptly whether or not Allstate is willing to offer its limits based upon an unlimited Rule 82 evaluation consistent with *Bohna* which makes it clear that Allstate should have offered its Rule 82 based upon an anticipated jury verdict.

On January 13, 1994, the Allstate representative, Bret Follett, and Dykman's lawyer, Dennis Mestas, discussed the claim by telephone. On January 19 Dykman reiterated his position in a letter to Follett. Dykman wrote:

We have *not* received a written response to our recent letter offering to settle for policy limits including supplemental payments for interest and unlimited Rule 82. I have received a verbal response from you but nothing definite was indicated by you as to Allstate's position.

Please indicate within 15 days whether or not Allstate will agree to pay its full policy limits including interest and unlimited Rule 82. If we have no response in that time, our offer shall be withdrawn. Please indicate the amount Allstate feels is its policy limits and how much it is offering.

On February 2 Follett responded. Follett wrote:

We are writing to confirm my earlier verbal response that Allstate accepts your offer to settle this case for Allstate's policy limits, based on the assumption that our policy limits include Rule 82 attorney's fees based on the value of the case and not based upon the stated policy limits.

. . . .

. . . We suggest that we provide you with a check for the face amount, plus pre-judgment interest and Rule 82 on the face amount, in exchange for two documents:

(1) a release of our policyholder; and

(2) an agreement by Allstate to pay any additional amounts owing on a projected jury verdict as ordered by a court.

We can then obtain information to evaluate the probable jury verdict and attempt to resolve it amicably as soon as possible. . . .

Follett wrote that Allstate would pay $100,-000 for the face limits of the policy, an unspecified amount of pre-judgment interest, and Rule 82 attorney's fees calculated on a probable jury verdict.

Dykman replied on February 7 and denied that Allstate's February 2 letter was a valid acceptance of Dykman's December 14 offer. Dykman's letter stated:

On February 2, 1994 we received a letter from you purporting to be an acceptance of our offer. It is not. It is a counteroffer containing conditions not acceptable to us. It states that Allstate will pay $100,000, unknown interest and Rule 82 on $100,000 right away, in exchange for a release and an agreement that Allstate will pay Rule 82 as determined by a Court.

This is not acceptable. We wish to avoid litigation, not agree to it. We will no longer negotiate. We will, however, make one more effort to resolve this on non-negotiable terms.

We hereby offer to accept a full policy limits offer including a quantified monetary amount of Rule 82, on a projected verdict, and quantified interest.

On February 9 Follett, responding to Dykman's letter, stated that Allstate's February 2 letter had "unconditionally accepted the offer stated in your letter of December 14, 1993." Allstate maintained that an agreement to settle for Allstate's policy limits already had been reached, requiring the parties to negotiate the projected jury verdict.

In March 1994 Allstate filed suit (the Allstate suit) seeking specific performance of the settlement agreement formed by its asserted February 2 acceptance of Dykman's December 14 offer. Dykman denied in his answer that there was a settlement agreement, and filed a counterclaim against Allstate and a third-party claim against Davis. Dykman also filed a separate personal injury action against Davis in March 1994.

Dykman moved for summary judgment in the Allstate suit on the issue of whether there was an enforceable settlement contract. Davis and Allstate opposed, and cross-moved on the same issue. The superior court granted Dykman's motion for summary judgment, ruling that there was no enforceable settlement agreement, and dismissed Allstate's complaint. The superior court later entered a final judgment on Dykman's third-party complaint against Davis, ruling that no settlement agreement had been reached.[4]

Davis and Allstate appeal the superior court's grant of summary judgment in favor of Dykman.

## III. *DISCUSSION*

### A. *Standard of Review*

██ This court reviews a grant of summary judgment *de novo. Nielson v. Benton,* 903 P.2d 1049, 1052 (Alaska 1995). We will affirm a grant of summary judgment if the evidence in the record presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Alaska R.Civ.P. 56(c); *French v. Jadon, Inc.,* 911 P.2d 20, 23 (Alaska 1996). We apply our independent judgment in interpreting the undisputed words of an offer to enter into a contract. *Cf. Martech Constr. Co., Inc. v. Ogden Envtl. Servs., Inc.,* 852 P.2d 1146, 1149 (Alaska 1993) ("This court will review *de novo* the trial court's grant of summary judgment based on the interpretation of a contract.").

### B. *Did the Parties Create an Enforceable Settlement Agreement?*

The main issue presented is whether the parties formed an enforceable settlement contract. We conclude that there was no valid offer to settle, because Dykman did not propose a specific amount or a method of calculating a specific amount. At most, Dykman simply offered to negotiate. Davis's "acceptance" therefore did not form an enforceable settlement agreement.

### 1. *A valid offer must encompass all essential terms.*

██ The formation of a valid contract requires an offer encompassing all essential terms, unequivocal acceptance by the offeree, consideration, and an intent to be bound. *E.g., Young v. Hobbs,* 916 P.2d 485, 488 (Alaska 1996) (citations omitted) (holding that parties to an alleged settlement agreement did not agree to a material issue); *Childs v. Kalgin Island Lodge,* 779 P.2d 310, 314 (Alaska 1989). An agreement is unenforceable if its terms are not reasonably certain. *See Hall v. Add–Ventures, Ltd.,* 695 P.2d 1081, 1087–89 (Alaska 1985) (ruling that the agreement was sufficiently definite to be enforceable); *see also Restatement (Second) of Contracts* § 33 (1981).

██ Dykman's December 14 letter states:

[W]e hereby offer to settle this case for Allstate's policy limits, based on unlimited Rule 82 on an anticipated jury verdict. Please inform us promptly whether or not Allstate is willing to offer its limits based upon an unlimited Rule 82 evaluation consistent with *Bohna* ....

That letter further states, "[w]e are willing to work with Allstate and negotiate as to the approximate jury verdict range in this case." Dykman's January 19 letter implies that his letters are invitations for Allstate to make an offer: "Please indicate the amount Allstate feels is its policy limits and how much it is offering."

Dykman did not make an offer in the December 14 or January 19 letters specifying an essential term of a settlement agreement, namely the dollar amount that Dykman would accept or the method that Dykman would accept to calculate such an amount. Although Dykman's counsel often used the word "offer" in his letters to opposing counsel, this usage was insufficient to create a valid offer to settle. Absent an offer encompassing the essential terms of a settlement agreement, the parties could not have formed

---

4. In July 1996 a jury in Dykman's personal injury action found that Dykman suffered compensable damages of $6.9 million, and that Dykman was twenty-five percent comparatively negligent.

Therefore, Dykman's compensable damages verdict against Davis was $5.18 million. The jury also awarded $45,000 in punitive damages against Davis.

a settlement agreement. *E.g., Young*, 916 P.2d at 488.

Allstate and Davis argue that implicit in Dykman's offer was a method for calculating the unlimited Rule 82 attorney's fees on an anticipated jury verdict.

According to Allstate, *Bohna v. Hughes, Thorsness, Gantz, Powell & Brundin*, 828 P.2d 745 (Alaska 1992), provides a method for calculating an anticipated jury verdict. Allstate claims that Dykman's December 14 letter, by offering "an unlimited Rule 82 evaluation consistent with *Bohna*," implicitly approved a specific method of calculating a jury verdict. Thus, according to Allstate, because both parties understood that *Bohna* set out a method of verdict calculation, Dykman's offer to settle is certain.

The *Bohna* opinion deals mainly with the calculation of Bohna's judgment. *Id.* at 752–60. The opinion discusses the settlement negotiations in the underlying tort claim, including the negotiation of a projected jury verdict required for calculating Rule 82 attorney's fees. *Id.* at 748–50. It does not discuss a specific method for arriving at an anticipated jury verdict. The opinion does suggest that an insurance company may always file a declaratory action on the issue, *id.* at 768 n. 58, but we disagree with Allstate's claim that there is a tangible *Bohna* method for calculating a projected jury verdict.[5] Nor are we aware of a specific method applicable in cases in which the verdict will probably include an award for intangible damages, such as pain and suffering.

■ Allstate and Davis also argue that the court should add terms to the writings according to the reasonable expectations of the parties. Because contracting parties cannot plan for all contingencies that might arise, a court may fill gaps in contracts to ensure fairness where the reasonable expectations of the parties are clear. *Rego v. Decker*, 482 P.2d 834, 837 (Alaska 1971); *see also Yeon St. Partners v. Environmental Consulting Servs., Inc.*, 125 Or.App. 501, 865

P.2d 1325, 1327 (1993) ("When the conduct or expressions of parties to an agreement indicate a sufficient intent to make a contract, a court has latitude to fill in the gaps....").

In *Rego*, we said "the courts should not impose on a party any performance to which he did not and probably would not have agreed." 482 P.2d at 837. Here, to add a method of calculating a projected jury verdict or inserting the amount of a projected jury verdict, a court would first have to determine an essential term to which the parties did not agree. This term would represent by far the largest part of the total settlement amount because the "contested, with trial" Rule 82 fees would be more than ten percent of a projected verdict against Davis. *See* Alaska R.Civ.P. 82(b)(1). Given the potential for a very large damages verdict in this case, the Rule 82 fees component could have been very significant, almost certainly a multiple of the face amount of Allstate's policy. Because a court should not impose on the parties any performance to which all the parties did not or would not have agreed, we cannot add any such terms here. *See Rego*, 482 P.2d at 837.

■ Davis additionally suggests that both parties did agree on a range of possible verdicts, allowing a court to find the settlement amount within this range. On August 29, 1994, Allstate offered to settle Dykman's claim for $1.016 million based on a projected jury verdict of almost $9 million. Dykman later stated in a letter to Davis's counsel, "[w]e agree that Allstate's valuation of the claim ($9,000,000) is in the range of possible verdicts." Based on this, Davis asks the court to enforce an agreement based on a mutually-acceptable projected $9 million verdict.

Davis's argument fails because there is no evidence the parties agreed to accept a projected $9 million verdict as the basis for the Rule 82 attorney's fees calculation. Dykman's statement that Allstate's $9 million verdict valuation was in the range of "possi-

---

5. Resolving the question through a declaratory action is not a method of calculation which the parties can apply absent judicial intervention. One alternative method is for the parties to agree to be bound by an independent expert's determination of economic losses. *See Schultz v. Travelers Indem. Co.*, 754 P.2d 265, 266 n. 1 (Alaska 1988). Neither Dykman nor Allstate suggested that the issue be referred to an independent expert.

ble" verdicts did not accept Allstate's offer of settlement. In addition, Dykman's statement is not contained in a response to Allstate's offer, but in a letter to Davis's counsel about a collateral matter. We again look to *Rego*, 482 P.2d at 837. We cannot find agreement about an anticipated $9 million verdict where Dykman as the offeree never accepted the offer.

Because *Bohna* contains no method for calculating a projected jury verdict and this is not a case in which a court can fill in the gaps, Dykman's December 14 letter is too indefinite to be a valid offer. Thus, Allstate's "acceptance" did not form a settlement contract.[6]

### 2. *A contract to negotiate is unenforceable.*

■ Dykman's offer was not sufficiently detailed to be the basis for an enforceable settlement acceptance. Nonetheless, Dykman's offer can be construed as an offer to negotiate with Allstate about the Rule 82 fees component.[7]

■ As a general rule, agreements to negotiate are unenforceable because they do not provide a basis for determining the existence of a breach or for giving an appropriate remedy. *See Ohio Calculating, Inc. v. CPT Corp.*, 846 F.2d 497, 501 (8th Cir.1988); *cf. Western Airlines, Inc. v. Lathrop Co.*, 499 P.2d 1013, 1019 (Alaska 1972) (ruling that a letter discussing future lease discussions was not a binding agreement). Further, where

parties are expected to draft and execute a formal agreement, their prior negotiations do not constitute a contract. *Thrift Shop, Inc. v. Alaska Mut. Sav. Bank,* 398 P.2d 657, 659 (Alaska 1965) (holding that an oral contract to lease had never come into existence).[8]

Dykman's attorney stated in his December 14 letter that he was willing to negotiate a policy limits settlement based on unlimited Rule 82 attorney's fees.

> We are willing to work with Allstate and negotiate as to the approximate jury verdict range in this case and arrive at a settlement based upon unlimited Rule 82 applied against a fair damages evaluation, provided Allstate agrees its limits include unlimited Rule 82 based on an anticipated verdict.

Assuming that Allstate accepted this offer in its February 2 letter,[9] the parties would have entered into an agreement to negotiate. The subject of negotiations presumably would have been the amount of a projected jury verdict for the purpose of calculating the attorney's fees.

Negotiation normally is a process of attempting to reach a point of agreement, or, in this case, a single settlement figure based on a projected jury verdict. In theory, an agreement to negotiate is an enforceable contract in the sense that the parties can be made to participate in negotiations. However, participation in negotiation does not nec-

**6.** Davis argues that there is an enforceable settlement agreement with an open price term. A sale of goods agreement is enforceable without specifying a price for the goods if the parties so intend because of the ease of valuing commercial goods. *See generally* 2 Ronald A. Anderson, *Anderson on the Uniform Commercial Code* § 2–305 (1982); *see also* AS 45.02.305. However, unlike goods, the damages suffered by quadriplegics are not easily valued because of the large number of variables inherent in such injuries.

**7.** The interpretation of the words in a contract presents a question of law for the court, whereas resolution of disputes regarding surrounding circumstances is for the trier of fact. *Zuelsdorf v. University of Alaska*, 794 P.2d 932, 933 (Alaska 1990).

**8.** The *Thrift Shop* court also recognized:
It is true that words and acts of the parties may constitute sufficient manifestations of as-

sent to make a binding oral contract, even though the parties also had contemplated that their agreement would later be reduced to writing. But such an oral contract would exist only if the parties had definitely agreed on the terms that they planned to incorporate into the writing, and had agreed that the final writing would contain those provisions and no others. 398 P.2d at 658–59 (footnote omitted). *See also Restatement (Second) of Contracts* § 27 (1981) (existence of contract where written memorial is contemplated).

**9.** As an alternative ground for affirming, Dykman claims that if his letters were offers, Allstate's purported acceptance on February 2 was a counteroffer. We need not discuss this proposition, given our conclusion that Dykman made no enforceable offer to settle.

essarily mean that the parties will be able to agree to mutually-acceptable terms.

The hallmark of negotiation is bargaining, and the parties ultimately may be unable to resolve their dispute without outside help, such as by relying on the courts or alternative dispute resolution. *See Schultz v. Travelers Indem. Co.*, 754 P.2d 265 (Alaska 1988) (in similar settlement negotiations, the parties agreed to be bound by an independent expert's determination of economic losses and had stipulated non-economic losses, but disagreed on whether the insurance policy limits included unlimited Rule 82 fees on a projected verdict plus pre-judgment interest). Without agreeing on a more specific way of resolving their differences, any agreement to negotiate would have been too indefinite to enforce.

More fundamentally, parties who have merely agreed to negotiate necessarily have retained the ability to say "no" to the terms proposed by the other party; that means that it is not inevitable that the parties will be able to agree. Thus, agreement to negotiate could not have been an enforceable agreement that had the effect of settling Dykman's personal injury claims against Davis.

## IV. *CONCLUSION*

There is no enforceable settlement agreement.

AFFIRMED.