**COPPER RIVER SCHOOL DISTRICT, Appellant,**

v.

**Doyle TRAW, Barbara Goozen, Beverly Goad, Gary Stenberg, Karen Stenberg, Stanley Wallace, Teachers' Retirement System, Alison Algee, Deputy Commissioner of Administration and Janet Parker, Administrator, Teachers' Retirement System, Appellees.**

No. S–8743.

Supreme Court of Alaska.

Sept. 29, 2000.

Richard B. Brown and William W. Whitaker, Holmes Weddle & Barcott, Anchorage, for Appellant.

Robert M. Johnson, Wohlforth, Vassar, Johnson & Brecht, Anchorage, for Appellees Doyle Traw, Barbara Goozen, Beverly Goad, Gary Stenberg, Karen Stenberg, and Stanley Wallace.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

I. *INTRODUCTION*

Soon after the Copper River School Board passed a motion to offer retirement incentives to teachers with seniority, school district administrators realized that they had erroneously calculated the financial effect of the incentives. But before the school board met again and rescinded its motion, six teachers communicated their "acceptance" of the retirement program. The school district refused to pay the six teachers the amounts the motion had specified. The teachers sued for breach of contract and won on summary judgment in the superior court. The school district appeals. Because there are disputed issues of material fact about whether the school board's motion was an offer and whether the district's acts terminated the

teachers' power of acceptance, we reverse and remand.

## II. FACTS AND PROCEEDINGS

In early 1996 the Alaska legislature was considering a teachers' retirement incentive package (RIP) to ease the salary burdens on school districts in Alaska. The Copper River School District sought to take advantage of this proposed legislation. In March 1996 Copper River School District Superintendent George Maykowskyj directed the school district's business manager, Loreen Kramer, to determine how the district could or should augment the state's proposed retirement incentives.

Kramer presented her financial analysis to the Copper River School Board at its April 2 meeting. She told the school board that the district could save money by offering the teachers a payment "equal to what I understood would be the indebtedness to [the retirement fund] incurred by retiring teachers under the bill being considered by the Legislature." The school board, accordingly, voted at its April 2 meeting in favor of the following motion:

> MOTION ... to offer a retirement incentive equal to the employee's indebtedness for three years (8.65% of gross wages for certified [employees] ... ) to all certified and classified employees who are eligible to retire at the end of the school year and/or meet the requirements as established by the state for RIP. The employee must notify the District by April 30, 1996 if they plan to participate.

Within a few days Kramer decided that she had erred. The retirement program the school board had approved would cost the district more than it would save. On April 8 Kramer e-mailed the district's school principals, urging them to

> [p]lease inform your employees that may be eligible for retirement that I am waiting for a response from our attorneys concerning the "Longevity Bonus" offered by the

school board and possibly entering into an agreement with the Retirement System for a "Retirement Incentive Program". It appears that there are some additional costs to the district that I was not aware of so we may have to "re-think" the process. I'll have an answer by the end of the week.

In early April Teacher Beverly Goad called Kramer to "get the specifics of the RIP offer." Kramer told her that the district's lawyer had advised the school board to rescind the incentive motion, and that the school board would be meeting to do just that. Goad asked what would happen if the teachers accepted the incentive prior to the rescission meeting. Kramer responded, "You can't do that." Asked by Goad whether teachers needed to accept the incentive before the meeting, Board President Linda Marchini told Goad, "Please don't." Goad then apparently reported these comments to the other teachers involved in this case.

Some teachers decided to accept the "offer" before the meeting. On April 18 six teachers delivered letters communicating their "acceptance" of the terms of the April 2 program.[1]

On April 19 the school board met and rescinded the April 2 motion. It then passed a motion approving a modified retirement incentive package.

The six teachers requested payment of retirement benefits under the April 2 plan, but the district refused to pay more than the April 19 plan envisioned. The six teachers then sued for breach of contract, among other things. The teachers and the district cross-moved for summary judgment, and the superior court granted summary judgment to the teachers on the breach-of-contract question.[2] The district appeals. It argues that (1) the board's April 2 motion was not an offer the teachers could accept, and (2) even if it was an offer, communications from the district's administrators prevented the teachers from accepting it.

---

1. The six teachers are Doyle Traw, Barbara Goozen, Beverly Goad, Gary Stenberg, Karen Stenberg, and Stanley Wallace.

2. In a related, pending case, the district is suing the Teachers' Retirement System (TRS). The district and TRS have agreed to defer further activity on the third-party claims until the present case is resolved.

## III. DISCUSSION

### A. Standard of Review

 On questions of contract formation, we review grants of summary judgment de novo.[3] We "will affirm a grant of summary judgment if the evidence in the record presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."[4] We will accordingly not affirm a summary judgment if the record presents issues of material fact or if the moving party is not entitled to judgment as a matter of law. On questions of law, we are not bound by the lower court's decision.[5] Our duty is "to adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[6]

### B. Was the Motion an Offer?

The district contends that the school board did not make an offer when it passed the April 2 motion. Rather, it argues, the school board was instructing the superintendent and the superintendent's staff to make an offer. Thus, there could have been no offer subject to acceptance until the administrative staff communicated one to the teachers. The teachers contend, and the superior court held, that the April 2 motion was an offer, made in accordance with the power and practice of the school board.

Was the motion an offer, or did it merely authorize district administrators to make an offer?

1. *Contract formation in the government context, generally*

 Restatement (Second) of Contracts sections 24 and 26 (1981) delimit what can be considered an offer. Section 24 defines an offer as "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."[7] Section 26 informs us that "[a] manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent."[8]

Two factors are relevant: the language of the motion, and the teachers' understanding of the board-administration relationship.

 According to one leading municipal corporations treatise, the language of a motion has the following contractual significance: "[A]n ordinance granting a right, accepted and acted upon by the grantee, becomes an irrevocable contract. But an ordinance or resolution authorizing the mayor, or other officers[,] to enter into a contract does not of itself create a contract, if not acted upon."[9]

The Oregon Supreme Court quoted this language in *Winklebleck v. City of Portland*.[10] That case illuminates the issues presented here. The city condemned Winklebleck's property in order to extend a road; Winklebleck learned from city officials that the city needed only some of his property.[11] He lobbied for return of the rest of his property, and the city council passed a motion directing the city auditor to return the disputed land if Winklebleck filed a release.[12] The motion stated that "upon the execution and filing of such document with the City

3. *See Davis v. Dykman*, 938 P.2d 1002, 1006 (Alaska 1997).

4. *Id.*

5. *See Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

6. *Id.*

7. Restatement (Second) of Contracts § 24 (1981). *See also Young v. Hobbs*, 916 P.2d 485, 488 (Alaska 1996) (setting out requirements for formation of express contract).

8. Restatement (Second) of Contracts § 26 (1981). *See also Thrift Shop, Inc. v. Alaska Mut. Sav. Bank*, 398 P.2d 657, 658–59 (Alaska 1965) (citing Restatement).

9. 10 Eugene McQuillin, *The Law of Municipal Corporations* § 29.03, at 247 (3d ed.1999).

10. 147 Or. 226, 31 P.2d 637, 641 (1934) (the words "or other officers" do not appear in *Winklebleck*).

11. *See id.* at 638.

12. *See id.* at 638–39.

Auditor [the property] shall be released." [13] The city then realized that it had erred, and a city attorney told Winklebleck's attorney that Winklebleck could not reclaim the land.[14] The council repealed its earlier ordinance, but before it did so, Winklebleck accepted the offer and delivered a declaration of compliance with the requirements of the ordinance; he apparently also delivered a release.[15]

The court reasoned that the ordinance "did not contemplate that the auditor and the plaintiff should execute some contract before the language could be closed ... but that the lot owner should demonstrate his right to secure [the land] by waiving the privilege of an appeal," and taking other actions commensurate with ownership.[16] The court held that the ordinance was a valid offer, and that because Winklebleck had accepted the offer, he was entitled to his land.[17]

■ The *Winklebleck* court held a motion "fairly capable of construction as an offer" to be an offer.[18] But even if a motion is fairly capable of being construed as an offer, the issue is not conclusively resolved. For example, if a person had a history of dealings with a municipality, and had reason to know that the municipality did not intend to make an offer (whatever the language of its ordinance), a court should apply Restatement section 26, and should not treat the ordinance as an offer.[19] Accordingly, when a board motion is expressed in terms of a delegation, it should be considered a delegation and not an offer; but when it is couched in terms of an offer, further inquiry may be required.

■ When there is a continuing relationship like the employment relationship here, the language of the motion must be considered in context of the contracting parties'

relations.[20] The commentary to Restatement section 26 includes language to this effect:

If the addressee of a proposal has reason to know that no offer is intended, there is no offer even though he understands it to be an offer. "Reason to know" depends not only on the words or other conduct, but also on the circumstances, including previous communications of the parties and the usages of their community or line of business.[21]

One writer notes:

That the alleged offeree has reason to know that no offer has been made depends not solely on the words used but also on the circumstances surrounding the communication. Thus, if the parties have dealt with one another before ... or if the custom in a particular location or trade suggests that an offer is intended ... an offer will be found.[22]

■ This leaves us with the following process. First, courts must look to the language of the motion. If the motion is not expressed in terms of an offer, there is no offer. If the motion is expressed in terms of an offer, courts must look to the underlying context. If the context suggests that the legislative body normally acts as an offeror, there is a valid offer. But if the context suggests that the legislative body normally delegates the role of making the offer, a presumption arises that the motion is not an offer, but a delegation of power to make an offer. For a motion to be an offer, then, its language must be clear enough to overcome this presumption.

This approach answers the district's public policy argument that it "should not automatically be bound every time its board passes a motion." The school board can prevent itself from being bound merely by incorporating

13. *Id.* at 639.

14. *See id.* at 639–40.

15. *See id.* at 640.

16. *Id.* at 641–42.

17. *See id.* at 641–43.

18. *Id.* at 641.

19. *See* Restatement (Second) of Contracts § 26 (1981).

20. *See id.*

21. *Id.* at § 26 cmt. a.

22. 1 Richard A. Lord, *Williston on Contracts* § 4:7 (4th ed.1990).

into its motions appropriate delegation language, such as "the board delegates the authority to" carry out specific tasks. We deal below with the other part of the district's public policy question—what happens when a school board makes a mistake and the district's administrators realize it.

### 2. *Contract formation in this case*

The language of the motion suggests that the motion was itself an offer. The motion's relevant language reads: *"MOTION* by Turner and seconded by Kimball to offer a retirement incentive. . . . The employee must notify the District by April 30, 1996 if they plan to participate." The district nearly concedes this point, noting that whether the motion was an offer "turns on whether under the circumstances the Plaintiffs were justified in viewing it as one."

Assessing the underlying context of the offer implicates three circumstances: (1) whether and how the offer was conveyed to the teachers; (2) the official structure of the school district; and (3) the history of past dealings.

Restatement section 26 is concerned with the state of mind of the recipient of the offer. It asks whether "the person to whom it is addressed knows or has reason to know that the person making it" does not intend for it to be considered an offer.[23] The district asserts that "it was not reasonable to view the motion as an offer."

The district contends that the offer was not conveyed to the teachers, although it concedes that "those persons attending the meeting, hearing of the meeting, or in possession of the minutes could be said to have received the 'offer.'" The teachers do not argue that the district conveyed the "offer" more clearly after the board passed the motion. They contend that at least one of them attended the April 2 school board meeting and heard the board pass the motion, but it is not clear from the record how many of the six teachers were present.

The conveyance circumstance slightly favors the district. By publicizing the meeting's agenda in advance, the district might be said to have taken extra steps to convey the offer. But there are other valid reasons the district might have publicized the agenda (e.g., to promote public comment) without intending to convey an offer by passing a motion. And while an offer was not directly conveyed to the teachers merely because the school board passed the motion at a public meeting, it was indisputably made public knowledge.

The second circumstance here is the structure of authority in the school system. For purposes of this case, that structure is determined by Alaska statute and board bylaws and manuals.

Alaska Statute 14.14.090 contains an incomplete list of school board duties. It empowers school boards, among other things, to set total compensation levels: "In addition to other duties, a school board shall . . . determine and disburse the total amount to be made available for compensation of all school employees and administrative officers. . . ."[24]

The statute governing district bylaws provides that "school board policies relating to management and control of the district shall be expressed in written bylaws" adopted at board meetings.[25]

Alaska Statute 14.14.130 creates the position of the chief school administrator.[26] It empowers the administrator to "administer" the district, and to control school personnel decisions:

(b) [T]he [chief school] administrator shall administer the district in accordance with the policies that the school board prescribes by bylaw.

(c) [T]he [chief school] administrator shall select, appoint, and otherwise control all school district employees that serve under

---

**23.** Restatement (Second) of Contracts § 26 (1981).

**24.** AS 14.14.090.

**25.** AS 14.14.100.

**26.** The superintendent is the chief school administrator in the Copper River School District.

the chief school administrator subject to the approval of the school board.[27]

The Copper River School District policy manual states that "the Board has exclusive responsibility for all school policy. The Superintendent shall have the responsibility for executing the policy of the Board...." The manual also states that

> the Superintendent is the chief executive officer of the school system and has, under the direction of the Board, general supervision of all of the public schools and of all the personnel ... of the school system. The Superintendent is responsible for management of the schools under the Board's policies, and is accountable to the Board.

These provisions support the general conclusion that the superintendent is charged with carrying out the district's executive functions, while the school board acts as a legislative policymaker. Under this scheme, board actions are more likely delegations than offers. This circumstance strongly supports the district.

The third circumstance concerns past dealings. There is some dispute about whether teachers had previously negotiated personnel issues with the superintendent and administrators, or with the school board itself. The teachers offered inconclusive affidavits, in which they affied that they had dealt "directly with the school district." But these assertions do not explain whether the negotiations were with the school board or with the district's administrators. While there is some evidence that the teachers negotiated with the administrators, the evidence cited by both sides on this point is meager, particularly considering the importance of this issue.

In sum, it is unclear to what extent the school board normally delegates executive and negotiating authority to district administrators. If it has been standard practice to require the administrators to take executive action in order for the district to enter into contracts, a statement by the board should be considered a direct offer only if it clearly and specifically rejects or suspends that pattern of action. In this case, the motion "to offer" the retirement incentive was not accompanied by any such extraordinary language. Ultimately, the relationship between the board, the administrators, and the teachers here is a fact question for the fact finder.

Each side cross-moved for complete summary judgment. Each side thus certified that no genuine, material fact disputes precluded favorable summary judgment. Although neither side asserted that genuine fact disputes required denial of the other side's motion, each side advanced an account of the parties' past dealings that was irreconcilable with the other side's account. Under these circumstances, summary judgment was inappropriate because material questions of fact exist as to whether the context of the April 2 motion made it unreasonable for the teachers to consider it an offer. We remand to determine whether there was an offer within the meaning of Restatement sections 24 and 26.

### C. Did the District Terminate or Suspend the Teachers' Power to Accept Any Offer?

An offeror, by manifesting an intention not to enter into a proposed contract, can terminate the offeree's power of acceptance.[28] Invoking that principle, the district argues that even if there was an offer, the district's communications with the teachers revoked the offer or terminated their power to accept it. The teachers assert that only the board had the power to revoke the offer.

Recognizing the calculation error, administrators and an individual school board member tried to prevent teachers from accepting the incentive. Their communications, discussed above, did not use words that ex-

---

27. AS 14.14.130.

28. See Restatement (Second) of Contracts § 42 (1981) ("An offeree's power of acceptance is terminated when the offeree receives from the offeror a manifestation of an intention not to enter into the proposed contract."); id. at § 43 ("An offeree's power of acceptance is terminated when the offeror takes definite action inconsistent with an intention to enter into the proposed contract and the offeree acquires reliable information to that effect.").

pressly revoked the offer. We think the issue of the effect of the district's communications raises questions that should not be resolved in this appeal as a matter of law.

First, because the meaning of the words in the district's communications was not adequately litigated in the superior court, we decline to hold that those words are fairly susceptible to only one interpretation. The district gave the issue of their meaning only cursory attention in the superior court. The teachers did not address the issue there, nor have they on appeal. In holding that the district's statements did not revoke the April 2 offer, the superior court did not discuss or rely on the meaning of the statements. It relied instead on the proposition that only the board had authority to revoke a board offer.

The absence of express words of revocation is not necessarily controlling.[29] The history of past dealings—also relevant to whether the board's motion was an offer—is relevant to interpreting the words of the administrators and individual board members. It therefore appears that there may be genuine, material fact disputes about the meaning and effect of these communications. We consequently cannot decide as a matter of law whether these communications revoked any offer or otherwise terminated the teachers' power to accept a board-made offer.

Second, we cannot hold as a matter of law that only board action could terminate or suspend offerees' ability to accept a board-made offer.

The teachers point out that the school board could only act as a collective body. Board bylaws state that "[b]oard members have authority only when acting as a body in regular or special sessions." The bylaws also state that "[t]he Board shall not be bound in any way by any statement or action on the part of any individual Board member or employee of the District except when such statement or action is in pursuance of special

instructions by the Board or under specified delegation of responsibility."

Corporate and municipal organizations, by their nature, require executive actors to make just this sort of decision. The district has such executive actors, consisting of the superintendent and his staff; the school board endows them with the authority and powers necessary for carrying out board decisions, as noted above.

This case does not turn exclusively on whether only the school board could revoke a board-made offer. Instead, the question is whether the administrators could permissibly do things short of revocation that nonetheless had the legal effect of suspending the offer until the board could act or could otherwise terminate the teachers' power to accept the offer. The bylaws did not explicitly grant the superintendent the power to revoke a board offer upon learning it was based on erroneous information. Rather, the superintendent had the "responsibility of executing the policy of the Board." It could be argued that powers of "general supervision" and "policy interpretation to school staff" encompass the authority to revoke a school board offer or hold it in abeyance. While the superintendent does not have the authority to bind the board, he may have the authority to "unbind" it pending further consideration. This is an issue to be resolved on remand.

The dissent would reverse and remand with directions to enter judgment for the school district. The dissent reasons that communications received by the teachers suspended their power to accept any offer here. Absent a valid acceptance, of course, no contract was formed.

Although we agree with the dissent's legal analysis, we decline to rule on this question as a matter of law. The dissent relies heavily on the principles discussed in the Restatement (Second) of Agency (1958).[30] The parties did not discuss these propositions in their appellate briefs except in the most cur-

---

29. *See* Restatement (Second) of Contracts § 42 illus. 5 (1981) ("A makes an offer to B, and later says to B, 'Well, I don't know if we are ready. We have not decided, we might not want to go through with it.' The offer is revoked.").

30. Dissent at 290–291.

sory fashion and did not cite the provisions the dissent finds persuasive. We prefer not to reverse for entry of judgment for the appellant in this circumstance. Moreover, we decline to hold as a matter of law that the language used or the representatives' ostensible or inferred authority was necessarily sufficient to deprive the teachers (and each teacher individually) of any power to accept the alleged offer. We leave it to the parties on remand to assert any argument, not made to date, that the representatives' words were susceptible to more than one meaning or that one or more of the teachers should have realized that no offer could be accepted pending further school board action.

Finally, the district contends that, in accordance with comment d to Restatement section 43, "[t]he basic standard to which the offeree is held is that of a reasonable person acting in good faith." We agree with that principle. On remand the conduct of the teachers in accepting the offer should be considered in light of that standard.

## IV. CONCLUSION

For these reasons, we REVERSE the teachers' summary judgment and REMAND for further proceedings.

MATTHEWS, Chief Justice, with whom BRYNER, Justice, joins, dissenting.

I agree with the majority opinion that there are genuine issues of material fact as to whether the April 2 resolution was an offer capable of acceptance or whether it merely authorized school district administrators to make an offer. But I believe that even if the April 2 resolution was an offer, subsequent communications to the appellees suspended any power that the appellees may have had to create a binding contract by accepting the offer.

The communications to which I refer are those mentioned in the majority opinion. These are the April 8 e-mail from School District Business Manager Loreen Kramer, the early April conversation between appellee Beverly Goad and Kramer, and the sub-

sequent conversation between Goad and School Board Chairperson Linda Marchini.

The e-mail stated:

Please inform your employees that may be eligible for retirement that I am waiting for a response from our attorneys concerning the 'Longevity Bonus' offered by the school board and possibly entering into an agreement with the Retirement System for a 'Retirement Incentive Program'. It appears that there are some additional costs to the district that I was not aware of so we may have to 're-think' the process. I'll have an answer by the end of the week. Thanks.

The Goad conversations with Kramer and Marchini are described by Goad in her answer to interrogatories. She states:

Between the dates of April 3–16, 1996, I had a telephone conversation with Loreen Kramer, CRSD business manager. I had called her to get the specifics of the RIP offer that the CRSD board had made at the April 2 board meeting. During the course of this conversation she revealed to me the following:

The school district's lawyer had advised the school board to rescind the RIP incentive because they could not make an offer dependent upon something that the state legislature had not determined.

The offer was for 8.65 × 3 × wages. She also relayed that she had made errors in her calculations and that the district would not be saving as much money as she had initially told the school board at the April 2, 1996, meeting.

She then said that the school board would be meeting to rescind the April 2, 1996 RIP incentive motion.

I asked what would happen if we accepted it prior to the rescission meeting. I received the response, "You can't do that." I said that several of us had been discussing the RIP incentive and intended to accept it.

Following that conversation and after school, I went to the Copper Center Post Office where Linda Marchini, CRSD board chairperson, is employed. I then asked her about the information that I had re-

ceived from Loreen Kramer. She said Loreen said that the lawyer had advised them to rescind the motion and that the school board would be doing so at the special board meeting to be called later in the week. I asked her how she knew they would be rescinding the motion without discussion; she assured me that they would be definitely rescinding the motion. I asked her if they would be discussing the rescission at the meeting or if they intended to reconsider the motion at a later time. She replied that would remain to be seen. Then I replied that if we are interested in accepting the RIP incentive we needed to do that before the special board meeting. She said, "Please don't."

It was after these two discussions that the six of us who had previously been discussing our acceptance of the offer decided to take definitive action by writing our acceptance letters and delivering them prior to the special board meeting.

Taken individually or collectively, the communications were sufficient to convey to a reasonable person the message that the offer of April 2, at least temporarily, could not be accepted. The Kramer e-mail told the recipients that it appeared that the district had made a mistake in calculating the costs of the program and that it might have to be reconsidered. The telephone call from Goad to Kramer clearly communicated that the April 2 resolution was based on mistaken calculations, that a special meeting of the school board had been scheduled to rescind the resolution, and that the teachers could not accept the offer implicit in the resolution before the "rescission meeting." Similarly, the conversation with Board Chairperson Marchini confirmed that there would be a special board meeting at which the board would rescind the April 2 resolution.

An offeror need not formally state that an offer is withdrawn or revoked in order to terminate an offeree's power of acceptance.

Other facts besides a notice from the offeror may make it unreasonable for the offeree to accept and rely. The offeree should be held to the standard of a reasonable person. Any statement by the offeror to the offeree that even implicitly states that the offeror no longer regards the offer as a commitment constitutes a revocation.[1]

The communications to which I have referred were, to use the terms of the Restatement (Second) of Contracts section 42, "manifestation[s] of an intention not to enter into the proposed contract," "receive[d] from the offeror." As such they "terminated" the offeree's power of acceptance.

Important to an understanding of the meaning of the Restatement in context is Illustration 5 to section 42. Illustration 5 states, "A makes an offer to B, and later says to B, 'Well, I don't know if we are ready. We have not decided, we might not want to go through with it.' The offer is revoked." [2] If anything, the communications in the present case more strongly manifest an intention not to enter into a contract than the facts stated in Illustration 5. Kramer's e-mail, like Illustration 5, indicates an unreadiness and uncertainty as to whether to go forward with the original proposal just as Illustration 5 does. Under the illustration, that alone is sufficient to revoke the offer. But in the present case there is more, for in the subsequent telephone conversation with Goad, Kramer unequivocally stated that the offer could not be accepted prior to the special meeting at which the question of rescission would be taken up. ("You can't do that.") In so stating, she made crystal clear that the power to accept the offer was terminated.

With respect to these communications, the trial court held that they did not revoke the offer encompassed in the April 2 resolution because, "[o]nly the Board, acting as a body in session, had the authority to terminate its offer. Statements by administrators or

---

1. 1 Arthur L. Corbin, *Corbin on Contracts* § 2.20, at 227 (rev. ed.1993).

2. Restatement (Second) of Contracts § 42 cmt. d, illus. 5 (1981). This illustration is based on *Hoover Motor Exp. Co. v. Clements Paper Co.*, 193 Tenn. 6, 241 S.W.2d 851 (1951), in which the court concluded that the language "Well, I don't know if we are ready. We have not decided, we might not want to go through with it" "brought home to [the offeree] that [the offeror] no longer consented to the transaction" and so amounted to a withdrawal of the offer.

board members could not constitute a 'manifestation of an intention not to enter into the proposed contract.' " I believe that this conclusion is wrong and that applicable principles of the law of agency show that Kramer, at least, did have the authority to suspend the power to accept the April 2 offer. The principles on which I rely are expressed in sections 33, 43(1), 47, and 73 of the Restatement (Second) of Agency.

Section 33 provides:

An agent is authorized to do, and to do only, what it is reasonable for him to infer that the principal desires him to do in the light of the principal's manifestations and the facts as he knows or should know them at the time he acts.

Section 47 provides:

Unless otherwise agreed, if after the authorization is given, an unforeseen situation arises for which the terms of the authorization make no provision and it is impracticable for the agent to communicate with the principal, he is authorized to do what he reasonably believes to be necessary in order to prevent substantial loss to the principal with respect to the interests committed to his charge.

Section 73 provides that a manager has inferred authority to direct the ordinary operations of an enterprise. Comment b in the first paragraph states that authority to manage an enterprise does not include authority to make unusual or extraordinary contracts. But in the final paragraph of this comment the inference of authority to make unusual or extraordinary contracts in emergencies is described:

In all the above cases however, authority to act may be inferred from the circumstances of the authorization or from subsequent events, as where, in the absence of the principal, an emergency arises which can be met only by exceeding what is ordinarily the manager's authority.[3]

And finally, section 43(1) provides that in cases where the authority of the agent is ambiguous, subsequent acquiescence by the principal indicates that the conduct was authorized:

Acquiescence by the principal in conduct of an agent whose previously conferred authorization reasonably might include it, indicates that the conduct was authorized; if clearly not included in the authorization, acquiescence in it indicates affirmance.[4]

Kramer was the school district's business manager. As such, she was authorized to do what it was reasonable for her to infer that the school district would wish her to do in light of the facts as she knew them at the time that she acted.[5] When she acted in this case, she knew that the school district had relied on her calculations in passing the April 2 resolution and that these calculations were substantially mistaken and would prove to be very costly to the school district. In my view it was unquestionably reasonable for her to infer that the district would wish her to suspend the power to accept the April 2 offer and thus under section 33 of the Restatement, she had authority to do so.

Her authority is underlined by sections 47 and 73 of the Restatement which provide that an agent can take action reasonably believed by the agent to be necessary in order to prevent substantial loss to the agent's employer. That was certainly the case here.

And even if Kramer's authority under sections 33, 47, and 73 of the Restatement is regarded as ambiguous rather than clear, the subsequent rescission of the April 2 resolution by the board demonstrates that Kramer acted as the district desired her to act. This, to use the terms of section 43(1) of the Restatement, "indicates that [her] conduct was authorized."

In summary, the appellees knew when they purported to accept the offer on April 18 that it was based on mistaken calculations that were overly generous to them and that the school district no longer wished to go

3. Restatement (Second) of Agency § 73 cmt. b (1958).

4. Restatement (Second) of Agency § 43(1) (1958).

5. See Restatement (Second) of Agency § 33 (1958).

through with it. Since Kramer had authority under the law of agency to withdraw the offer pending the special meeting of the school board, appellees' purported acceptances did not result in the formation of contracts. For these reasons, I would reverse the judgment of the superior court and remand with directions to enter judgment in favor of the school district.