ALASKA TRADEMARK SHELLFISH,
LLC, Appellant,

v.

STATE of Alaska, DEPARTMENT OF
FISH AND GAME; Commissioner
Frank Rue; Doug Mecum; Scott Mar-
shall; and John Does 1–10, Appellees.

No. S–12120.

Supreme Court of Alaska.

Nov. 23, 2007.

See also, 91 P.3d 953.

Bruce B. Weyhrauch, Law Office of Bruce B. Weyhrauch, LLC, Juneau, for Appellant.

Joanne M. Grace, Assistant Attorney General, Anchorage, and David W. Márquez, Attorney General, Juneau, for Appellees.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

1. The geoduck is "an unusually large, slow-growing species of clam that commands high market prices." *Alaska Trademark Shellfish, LLC v. State (ATS I)*, 91 P.3d 953, 954 (Alaska 2004).

OPINION

EASTAUGH, Justice.

## I.  INTRODUCTION

Alaska Trademark Shellfish, LLC (ATS), applied to the State of Alaska for aquatic farming permits with concomitant rights to harvest wild geoducks.  After the State of Alaska denied ATS's application, ATS claimed that because the state had promised ATS that it could harvest wild geoducks, the state was obligated to reimburse ATS for its expenses in seeking the permits.  The superior court rejected this claim because it concluded that the state defendants were entitled to immunity.  Because we conclude that no evidence would permit an inference that the state actually promised ATS that it could harvest wild geoducks, we affirm.

## II.  FACTS AND PROCEEDINGS

Alaska Trademark Shellfish applied for state permits early in 1999 to allow it to engage in geoduck farming.[1]  ATS assertedly believed that these permits would allow it to harvest wild geoducks located on its farm sites; it therefore investigated farm sites with large stocks of wild geoducks.  When the Alaska Department of Fish and Game (ADF & G) had not acted on ATS's permit applications by February 2000, ATS sued the state and requested an injunction, damages, and declaratory relief.  ADF & G thereafter denied ATS's permit applications because ATS refused to agree not to harvest wild geoducks.  ATS appealed the denial to the superior court, asking the court to order ADF & G to issue the permits and to rule that the permits allowed ATS to harvest wild geoducks.  The superior court upheld ADF & G's decision to deny the permits, reasoning that the Alaska Constitution barred ADF & G from granting aquatic farmers the exclusive right to harvest wild geoducks.  ATS appealed to this court; we affirmed on the alternative ground that ADF & G lacked the statutory authority to grant aquatic farmers the exclusive right to harvest wild stocks.[2]

2. *Id.* (holding that ADF & G lacks statutory authority to grant aquatic farmers exclusive rights to harvest wild geoducks on their farm sites).

After we decided the permit appeal, ATS returned to the superior court and argued at a status hearing that it had a viable claim to recover the money it spent in reliance on ADF & G's alleged promises that ATS could harvest wild geoducks. The state defendants moved for declaratory judgment, contending that ATS's claim was not viable because ATS failed to adequately plead and preserve the claim, and because ADF & G and its officials were immune from suit. The superior court entered a declaratory judgment for the state defendants; it held that ADF & G and its officials were immune from suit under AS 09.50.250 and the doctrine of official immunity.

ATS appeals.[3]

## III. STANDARD OF REVIEW

Although ATS's appeal challenges a declaratory judgment, because the declaratory judgment was in effect a complete summary judgment, we will apply the summary judgment standard of review.[4] We review a grant of summary judgment de novo.[5] Summary judgment is proper if there is no genuine factual dispute and the moving party is entitled to judgment as a matter of law.[6] We can also affirm a grant of summary judgment on alternative grounds, based on "any matter appearing in the record."[7]

## IV. DISCUSSION

ATS raises four issues on appeal. First, it argues that it adequately pleaded and preserved its damages claim. Second, it argues that it presented sufficient evidence to support an estoppel claim. We treat this as a claim for promissory estoppel.[8] Third, it claims that the court erred in applying the doctrines of sovereign and official immunity. Fourth, it requests that we reverse the superior court's award of attorney's fees to the state.

For the purpose of this appeal, we assume but do not decide that ATS adequately pleaded and preserved its damages claim. Because we conclude that the record contains no evidence permitting an inference that the state actually promised ATS that it could harvest the wild geoducks, complete summary judgment in favor of the state defendants was proper. We therefore do not need to address the issues of sovereign immunity and official immunity.

### A. ATS Cannot Prove Promissory Estoppel Because There Was No "Actual Promise."

Four elements are necessary to prove a claim of promissory estoppel: (1) an "actual promise" that induces the action or forbearance; (2) the action or forbearance was actually foreseen or reasonably foreseeable; (3) the action or forbearance amounted to a substantial change of position; and (4) enforcement of the promise is necessary in the interest of justice.[9] If there is no "actual

---

3. The appellees are the State of Alaska, ADF & G, and various state employees and officials. We refer to them collectively as the state, ADF & G, or the state defendants.

4. Cf. Greater Anchorage Area Borough v. City of Anchorage, 504 P.2d 1027, 1030–31 (Alaska 1972) (holding that judgment can be final although superior court does not call it final judgment).

5. McCormick v. Reliance Ins. Co., 46 P.3d 1009, 1011 (Alaska 2002).

6. Id.

7. Ransom v. Haner, 362 P.2d 282, 285 (Alaska 1961) (observing that appellate court can consider any matter appearing in record to affirm lower court's decree).

8. Although ATS argues in its opening brief that it was entitled to "equitable estoppel," the state

correctly contends in its appellee's brief that ATS is actually seeking promissory estoppel. As we have previously held, the "primary difference between promissory and equitable estoppels is that the former is offensive, and can be used for affirmative enforcement of a promise, whereas the latter is defensive, and can be used only for preventing the opposing party from raising a particular claim or defense." Simpson v. Murkowski, 129 P.3d 435, 440 n. 18 (Alaska 2006) (quoting Mortvedt v. State, Dep't of Natural Res., 858 P.2d 1140, 1143 n. 7 (Alaska 1993) (citation omitted)).

9. Zeman v. Lufthansa German Airlines, 699 P.2d 1274, 1284 (Alaska 1985) (applying RESTATEMENT (SECOND) OF CONTRACTS § 90 (1979); State v. First Nat'l Bank, 629 P.2d 78, 81 (Alaska 1981); 1A ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 200, at 215–21 (1963)).

promise" that induces the action or forbearance, there can be no promissory estoppel.[10] As the state argues, the actual promise must be "definitive," must be "very clear," and must use "precise language."[11] An actual promise is "analytically identical" to the acceptance of an offer in contract law.[12] This means that an actual promise must manifest an unequivocal intent to be bound.[13]

ATS argues that ADF & G made an actual promise that ATS "could harvest and sell standing stocks of geoducks" located on its aquatic farm sites. ATS identifies three statements that it considers "unequivocal promises" to that effect. The state responds that although some rights to wild stock passed with stock acquisition permits (which are issued separately from aquatic farming permits), "those permits limited the farmers' use of the stock to providing brood or seed stock, or for growing out stock with controlled, enhanced cultivation."[14]

We will examine in turn the three statements identified by ATS.

■ The first statement was made by ADF & G's mariculture coordinator and was disseminated at an aquatic farming convention in 1996. It reads:

> [A stock acquisition permit] authorizes you to acquire the target species you want to farm and transfers the ownership to you. The plant or animal acquired becomes private property at that point. It is the document that takes the resource out of the public domain and becomes yours to culture and sell.

ATS interprets this statement as a promise that a farmer may either culture or sell wild geoducks. The state has two responses. First, it argues that this statement merely explains what rights will pass with a stock acquisition permit, and asserts that it is not a

promise that farmers may obtain such permits for the purpose of "harvesting and selling wild stocks for profit *without cultivation.*" (Emphasis in original.) Second, it emphasizes that a farmer who obtains a stock acquisition permit can only use wild stocks "for the purposes allowed under the terms of the permit."

We agree with the state. As we previously observed in *Alaska Trademark Shellfish, LLC v. State (ATS I )*, "[p]ertinent statutes do not authorize a farmer to use standing, wild stocks of geoducks for harvest and sale without having first 'propagated, farmed, or cultivated' the wild geoducks."[15] Because ADF & G's first disputed statement does not promise farmers that they can acquire stock acquisition permits for the purpose of commercial harvest, and because farmers were required to "culture and sell" wild stocks if they obtained such a permit, this statement is not a promise that farmers could harvest wild geoducks for commercial purposes even if they successfully acquired a stock acquisition permit.

■ The second disputed statement comes from a 1999 letter from ADF & G's commissioner to shellfish growers: "The department believes that property rights to 'standing stocks' pass to the permittee with the lease, operations permit[,] and stock acquisition permit." ATS does not analyze this statement in much detail, saying only that it was a reiteration of the first statement. The state argues that "[t]his letter merely states that if and when all of the necessary permits are in place, the standing stocks belong to the permittee. The commissioner did not assert, much less promise, that a stock acquisition permit would allow an applicant to acquire wild stocks for direct harvest and sale."

---

**10.** *First Nat'l Bank,* 629 P.2d at 81.

**11.** *Simpson v. Murkowski,* 129 P.3d 435, 442–43 (Alaska 2006) (holding that governor's letter proposing phased elimination of longevity bonuses was not actual promise because it was not "sufficiently definite").

**12.** *Brady v. State,* 965 P.2d 1, 6, 11 (Alaska 1998) (holding that state did not promise to sell timber even though state official said "we will begin

preparation of a sale in the area requested upon receipt of the presale deposit").

**13.** *Id.* at 10.

**14.** *See* AS 16.40.120 (2004) (governing aquatic stock acquisition permits); AS 16.40.100 (2004) (governing aquatic farming permits).

**15.** *Alaska Trademark Shellfish, LLC v. State (ATS I )*, 91 P.3d 953, 955 (Alaska 2004).

We are again convinced by the state's argument. The commissioner's letter does not state that an aquatic farmer is entitled to a stock acquisition permit if he or she wishes to harvest standing wild stocks; it merely states that undefined "property rights" to the stocks pass to the farmer once he or she obtains the necessary permits. The limits on those property rights have already been discussed above.

 The third disputed statement is contained in a 1999 ADF & G internal email that states: "Simply put, the standing stock (pre-existing wild stock) on a leased and permitted aquatic farm site becomes the property of the aquatic farm site operator, to be disposed of in any legal manner." As the state argues, this statement could not be interpreted by a reasonable fact finder to be a promise made to ATS because the statement was contained in an ADF & G internal email sent in September 1999, months after ATS had filed its permit applications. An actual promise must be made to the promisee, and it must be made before the promisee either acts or suspends action.[16]

Promissory estoppel "enable[s] the courts to enforce contract-like promises made unenforceable by technical defects or defenses."[17] Because there is no evidence that would allow a reasonable fact finder to infer that ADF & G promised ATS that geoduck farmers could obtain permits for the purposes of harvesting standing wild stocks, we conclude as a matter of law that ATS has no cause of action for promissory estoppel. The state was therefore entitled to complete summary judgment on the alternative ground that ADF & G never promised ATS the right to harvest wild geoducks on its farm sites.[18]

Further, given the nature of the ADF & G statements and the common property clauses in the Alaska Constitution, no reliance on the statements would be reasonable.[19]

## V. CONCLUSION

We therefore AFFIRM the judgment on the alternative ground that ADF & G never made an actual promise to ATS.

---

**16.** *See Zeman,* 699 P.2d at 1284 (applying RESTATEMENT (SECOND) OF CONTRACTS § 90 (1979); *First Nat'l Bank,* 629 P.2d at 81; 1A ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 200, at 215–21 (1963)). Because the Restatement uses the language "promisor" and "promisee," the promise must be made to the person who subsequently acts or suspends action, unless the Restatement's third-party analysis applies. Because the promise must induce the action or forbearance, it must precede the action or forbearance.

**17.** *Brady,* 965 P.2d at 10.

**18.** Because ATS has failed to state a claim for promissory estoppel, we do not need to consider whether the state and its employees are immune from suit. ATS also argues that the superior court's award of attorney's fees against ATS must be overturned because on remand ADF & G will no longer be the prevailing party. Our rejection of ATS's liability claim disposes of this argument.

**19.** Alaska Const. art. VIII, § 1.