**SEA HAWK SEAFOODS, INC., an Alaskan corporation, Appellant and Cross–Appellee,**

v.

**CITY OF VALDEZ, a municipal corporation, Appellee and Cross–Appellant.**

Nos. S–14078, S–14098.

Supreme Court of Alaska.

July 27, 2012.

---

James E. Torgerson and Leonard J. Feldman, Stoel Rives LLP, Anchorage, for Appellant.

William M. Walker and Joseph N. Levesque, Walker & Levesque, LLC, Anchorage, for Appellee.

Before: CARPENETI, Chief Justice, FABE, and STOWERS, Justices.

*OPINION*

STOWERS, Justice.

## I. INTRODUCTION

Sea Hawk Seafoods, Inc. sued the City of Valdez for damages after Valdez applied for a grant from the State of Alaska for funding to convert Sea Hawk's seafood processing facility into a fish meal plant but then declined to accept the $600,000 grant that the State conditionally awarded to Valdez. On pre-trial motions, the superior court dismissed Sea Hawk's claims for breach of contract, breach of an agreement to negotiate, and breach of a duty to negotiate in good faith. Valdez and Sea Hawk filed cross-motions for summary judgment on Sea Hawk's remaining claim for promissory estoppel, which the court denied. Shortly before trial, the court dismissed Sea Hawk's promissory estoppel claim as a discovery sanction. Sea Hawk and Valdez both appeal.

Sea Hawk's claims are based on statements made and a letter sent by the Valdez City Manager to the owner of Sea Hawk. Because these communications, even when viewed in the light most favorable to Sea Hawk, are insufficient as a matter of law to support Sea Hawk's claims, we affirm the superior court's rulings dismissing Sea Hawk's breach of contract and negotiation claims, but we reverse the court's ruling denying Valdez summary judgment on Sea Hawk's promissory estoppel claim.

## II. FACTS AND PROCEEDINGS

### A. Facts

Sea Hawk owned and operated a seafood processing plant in Valdez. In 2003 in response to declining salmon prices, the State established the Fisheries Economic Development Grant Program to assist qualifying businesses in the seafood industry. Sea Hawk was struggling to survive as a traditional seafood processor at that time, so Terry Bertoson, Sea Hawk's owner and sole shareholder, developed a plan with Norquest Seafoods, Inc. to convert Sea Hawk's processing facility into a fish meal plant. Sea Hawk agreed to contribute its existing buildings and equipment, Norquest agreed to contribute meal plant equipment, and the grant would provide the funds necessary to purchase and install additional odor abatement equipment. Bertoson initially planned to submit his own proposal directly to the State, but decided to ask Valdez to submit the grant application in order to demonstrate to the State that the project would benefit not only a private business but also the local community.

In April 2003 Bertoson contacted David Dengel, the Valdez City Manager, and requested that Valdez submit the grant application on Sea Hawk's behalf. According to Bertoson, Dengel indicated Valdez would be interested in supporting the project and, in the course of their discussions over the next two months, promised him Valdez would submit the grant application and, if awarded the grant, pass the funds through to Sea Hawk.

In May 2003 Bertoson sent a draft grant application to Dengel. On May 27 Dengel presented the plan to the Valdez City Council at a work session.[1] Bertoson claims that after this work session, Dengel informed him the City Council had approved the project and reiterated his earlier promise that Valdez would submit the application and, if awarded the grant, pass the funds through to Sea Hawk. On May 30 Dengel sent Bertoson a letter confirming Valdez's support for the grant application and outlining the remaining issues to be resolved. The letter stated:

I am finalizing the application for [the] Fisheries Economic Development Matching Grant Program grant. If the City is successful in the application process for the Fish Meal Plant, there are a number of issues that will need to be resolved before the City accepts the grant.

As I have indicated previously, the City will not be putting any of its own funds into the project. Any match or cost overruns will need to be covered by you and any partners. Because this is a pass through grant, there will need to be assurance[s] in place that indemnify the City for any compliance issues that may arise in the future. Since the State in the application states that the Program is still evolving all of the policy decisions have not yet been made. Another recurring issue is one of odor from the plant. There will need to be assurances that the plant will not produce an offensive odor. Once the State informs the City as to whether we received the grant we will need to put together an agreement that addresses all of these issues and any others that will arise[ ] between now and then.

If the City is not successful in getting the grant funds requested for the fish meal plant, the City is not responsible for the failure if any of Sea Hawk Seafoods.

Terry, the City is supportive of the project and the commercial fishing industry, we just need to make sure that the City is protected and indemnified.

Bertoson emailed Dengel that same day, agreeing to Valdez's conditions and asking

---

1. A work session is an informal meeting where the City Council receives and reviews information; no official decisions are made at a work session.

whether there was anything he needed to do. Dengel replied: "You do not need to do anything with the letter it is standard on the City's part."

Valdez submitted the grant application, requesting $950,000 for the proposed fish meal plant. The grant program required local government applicants to provide a resolution of support for their grant application. On June 2, 2003, the City Council passed a formal resolution of support, stating: "The City of Valdez supports the State of Alaska Fisheries Economic Development Grant Application for a Fish Meal Plant."

In August 2003 state officials visited Sea Hawk's facility in Valdez and prepared an analysis of the proposed fish meal plant, noting several issues with the proposal. The report recommended the State set aside $600,000 for the project, contingent upon these issues being addressed.

On March 15, 2004, the State notified Valdez it had been selected as a "potential recipient" of a $600,000 grant and asked Valdez to submit additional information about the proposal. On April 1 Dengel sent Bertoson a letter stating that Valdez had received a $600,000 grant but would not accept it until it had negotiated an agreement with Sea Hawk: "Be advised that even though the City has been notified of a grant award, the City has yet to accept the grant funds. Acceptance of the grant is contingent upon an agreement being successfully negotiated between the City, SeaHawk Seafoods, and Norquest." At a City Council meeting on April 5, council members and local citizens voiced concerns about odors from the proposed fish meal plant impacting the town's tourist industry. The City Council decided to request proposals for a fish meal plant located outside the harbor area of town, but did not receive any proposals in response to its request. On May 3, despite continuing concerns about potential odor issues, the City Council voted to negotiate an agreement with Sea Hawk for the operation of a fish meal plant. Valdez and Sea Hawk went through several proposed contracts, but were ultimately unable to reach a final agreement.

The State notified Valdez that it had until December 23, 2004, to make a decision regarding the grant award. On December 20 a council member moved to approve a final agreement with Sea Hawk and the motion failed. Consequently, Valdez did not accept the $600,000 grant. Sea Hawk continued operating for a few weeks in 2005 and 2007 before closing and selling its facility in 2008.

## B. Proceedings

In December 2006 Sea Hawk filed a complaint for damages against Valdez alleging six causes of action: (1) breach of contract; (2) promissory estoppel; (3) breach of a duty to negotiate in good faith; (4) breach of an agreement to negotiate a contract; (5) breach of fiduciary duties; and (6) failure to expend appropriated money. Over the next three years, Superior Court Judge pro tem Daniel Schally dismissed all of Sea Hawk's claims except for promissory estoppel, on motions for summary judgment and judgment on the pleadings.

In August 2009 both parties moved for summary judgment on the promissory estoppel claim. The superior court denied both parties' motions, ruling "[f]actual issues remain including most importantly whether an actual promise was made by the City to Sea Hawk."

In September 2010, shortly after deposing Sea Hawk's expert witnesses, Valdez filed a motion to compel discovery, alleging Sea Hawk had failed to respond to discovery requests and produce all of the materials its experts relied on in calculating Sea Hawk's damages. Valdez asked the court to exclude Sea Hawk's expert witnesses from testifying at trial or, alternatively, to impose litigation-ending sanctions under Alaska Civil Rule 37(b). On October 12, the day before trial was scheduled to begin, the superior court granted Valdez's motion for litigation-ending sanctions and entered a final judgment in favor of Valdez.

Sea Hawk and Valdez both appeal. Sea Hawk contends the superior court erred by dismissing its breach of contract claim on the pleadings under Alaska Civil Rule 12(c), dismissing its claims for breach of an agreement to negotiate and breach of a duty to negotiate in good faith on summary judgment, and

dismissing its promissory estoppel claim as a discovery sanction under Alaska Civil Rule 37(b). Valdez contends the superior court erred by denying its motion for summary judgment on Sea Hawk's promissory estoppel claim.

## III. STANDARD OF REVIEW

We review the superior court's rulings under Alaska Civil Rule 12(c) and on summary judgment de novo.[2] The standard for a Rule 12(c) motion is identical to the standard for a summary judgment motion: the superior court will grant the motion only if there are no genuine issues of material fact and, drawing all inferences in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law.[3] A Rule 12(c) motion is based solely on the pleadings, while a summary judgment motion may be supported by evidence outside the pleadings, such as affidavits, and depositions.[4]

## IV. DISCUSSION

### A. The Superior Court Properly Dismissed Sea Hawk's Breach Of Contract Claim Under Civil Rule 12(c).

Sea Hawk contends the superior court erred by dismissing its breach of contract claim, arguing it alleged all of the essential elements of a contract in its complaint and whether those allegations established a valid contract is a question of fact to be resolved at trial. A valid contract requires

"an offer encompassing all essential terms, unequivocal acceptance by the offeree, consideration, and an intent to be bound."[5] Valdez argues, as it did in its motion to dismiss Sea Hawk's claim under Civil Rule 12(c), that Sea Hawk's pleadings failed to allege an unequivocal expression of acceptance. We therefore examine Sea Hawk's complaint to determine whether it contains any factual allegations that could directly or inferentially be considered an unequivocal expression of acceptance.[6]

Sea Hawk alleged that it offered Valdez the right to use its fish meal plant proposal to apply for a grant from the State and that the May 30, 2003 letter from Dengel to Bertoson, which is set out verbatim in the complaint, confirmed Valdez's acceptance of this offer. Sea Hawk also alleged the City Council ratified this agreement when it passed a formal resolution of support for the grant application on June 2, 2003. On appeal, Sea Hawk maintains that Valdez's acceptance is reflected in the May 30 letter.

In *Valdez Fisheries Development Association v. Alyeska Pipeline Service Co.*, we held that a plaintiff failed to allege unequivocal acceptance under similar circumstances.[7] In that case we examined a letter from Alyeska informing Valdez Fisheries that its proposal for a wildlife rehabilitation center had been selected as the winning bid and stating the parties would begin to negotiate a contract as soon as possible.[8] The parties' negotiations

---

2. *Valdez Fisheries Dev. Ass'n v. Alyeska Pipeline Serv. Co.*, 45 P.3d 657, 664 (Alaska 2002) (summary judgment); *Hebert v. Honest Bingo*, 18 P.3d 43, 46 (Alaska 2001) (judgment on the pleadings).

3. *See Valdez Fisheries*, 45 P.3d at 664 (citing *Reeves v. Alyeska Pipeline Serv. Co.*, 926 P.2d 1130, 1134 (Alaska 1996)); *Hebert*, 18 P.3d at 46–47 (citing *Jennings v. State*, 566 P.2d 1304, 1310 n. 23 (Alaska 1977)).

4. *See* Alaska R. Civ. P. 12(c) ("After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment. ..."); *Hebert*, 18 P.3d at 46 ("The purpose of a Rule 12(c) motion is to 'provide a means of disposing of cases when the material

facts are not in dispute and a judgment on the merits can be achieved by focusing on the content of the pleadings and any facts of which the court will take judicial notice.'") (quoting 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE 2D § 1367, at 509–10 (1990)).

5. *Davis v. Dykman*, 938 P.2d 1002, 1006 (Alaska 1997).

6. *See Valdez Fisheries*, 45 P.3d at 665.

7. *Id.* at 664–65.

8. *Id.* at 663–64. Sea Hawk was also a party to this case—Valdez Fisheries had entered into an agreement with Sea Hawk to purchase its processing plant for use as a wildlife rehabilitation center if Alyeska awarded Valdez Fisheries the contract for the center. *Id.* at 662–63.

were unsuccessful, and Valdez Fisheries sued Alyeska for breach of contract.[9] We affirmed the superior court's dismissal of the claim under Alaska Civil Rule 12(b)(6), holding Alyeska's award letter did not communicate unequivocal acceptance of Valdez Fisheries' offer:

> The letter's second paragraph contains the language most strongly supporting Valdez Fisheries' contract claim. It states, "you have been selected as the winning bidder." But this language does not unequivocally express acceptance because it is susceptible to at least two alternative interpretations. These words could mean either "we accept your bid as written," or "we have chosen you as the contractor with whom we will negotiate." The remainder of the letter fully resolves this ambiguity. The letter's next paragraph ... states that "[w]e intend to begin the process of negotiating a contract as soon as possible." This passage requires a conclusion that Alyeska was not communicating an unequivocal acceptance of Valdez Fisheries' offer.[10]

■ Here, the May 30 letter stated Dengel was "finalizing the [grant] application" but warned "[i]f the City is successful in the application process ... there are a number of issues that will need to be resolved before the City accepts the grant." It also noted that the State's grant program was "still evolving" and "all of the policy decisions have not yet been made." The letter concluded "[o]nce the State informs the City as to whether we received the grant we will need to put together an agreement that addresses all of these issues and any others that will arise[ ] between now and then." Even when viewed in the light most favorable to Sea Hawk, the letter does not communicate unequivocal acceptance of an offer. Rather, it demonstrates Valdez contemplated entering into a future agreement with Sea Hawk addressing various issues—both those set forth in the letter and any others that might arise in the meantime—after the State finalized the grant program and determined whether to award a grant to Valdez.

Nor does the City Council's June 2, 2003 resolution of support communicate unequivocal acceptance. The resolution simply stated that Valdez supported the grant application: "The City of Valdez supports the State of Alaska Fisheries Economic Development Grant Application for a Fish Meal Plant." It did not state or imply the City Council was agreeing to unequivocally accept the grant if the State awarded it, or agreeing to pass those funds through to Sea Hawk.

Thus, the letter and resolution Sea Hawk relied on to demonstrate Valdez's acceptance of Sea Hawk's offer do not communicate unequivocal acceptance and are, therefore, insufficient as a matter of law to support Sea Hawk's breach of contract claim. Nor do any other allegations in Sea Hawk's complaint support a reasonable inference of unequivocal acceptance. Accordingly, we affirm the superior court's dismissal of Sea Hawk's breach of contract claim under Civil Rule 12(c).[11]

### B. Valdez Was Entitled To Summary Judgment On Sea Hawk's Promissory Estoppel Claim.

Valdez contends the trial court erred by denying its motion for summary judgment on Sea Hawk's promissory estoppel claim.[12]

---

**9.** *Id.* at 664–65.

**10.** *Id.*

**11.** Valdez also argued in its motion to dismiss Sea Hawk's breach of contract claim and on appeal that no valid contract was formed as a matter of law because neither the May 30 letter nor the City Council resolution complied with Valdez's charter provisions requiring that all contracts be authorized by the council, signed by the mayor and city clerk, and approved by the city attorney. Because we hold the letter and resolution did not communicate unequivocal acceptance, we do not reach the issue of whether, even if Sea Hawk had alleged all of the necessary elements of a contract, its contract claim would fail as a matter of law for failure to comply with Valdez's charter requirements.

**12.** Valdez also challenges several of the superior court's rulings striking evidence offered in support of its summary judgment motion and in opposition to Sea Hawk's summary judgment motion. Because we do not rely on any of this excluded evidence in holding that Valdez was entitled to summary judgement on Sea Hawk's promissory estoppel claim, the error, if any, was harmless. Therefore, we do not separately analyze those issues.

Valdez argues, as it did in its summary judgment motion, that Sea Hawk's allegations failed to establish an "actual promise."[13] Sea Hawk contends it produced sufficient evidence to at least create a question of fact regarding whether Valdez made an actual promise, relying, as it did in its summary judgment motion, on Dengel's alleged oral promises to Bertoson and the May 30 letter.

■ A party must allege four elements to support a claim for promissory estoppel: "(1) an actual promise that induced action or forbearance; (2) the action induced was actually foreseen or reasonably foreseeable; (3) the action amounted to a substantial change in position; and (4) enforcement of the promise is necessary in the interest of justice."[14] An actual promise must be "definitive, ... very clear, ... and must use precise language."[15] "An actual promise is 'analytically identical' to the acceptance of an offer in contract law," meaning the promise "must manifest an unequivocal intent to be bound."[16] "Were it otherwise, promissory estoppel, which is intended 'to enable courts to enforce contract-like promises made unenforceable by technical defects or defenses,' would become a device by which parties could be held to contracts they did not accept."[17]

■ *Valdez Fisheries* is once again instructive. In addition to a breach of contract claim, Valdez Fisheries asserted a promissory estoppel claim against Alyeska based on the award letter stating "you are the winning bidder."[18] Because we had already held the letter did not constitute unequivocal acceptance of an offer for contract purposes, "[i]t therefore was not an 'actual promise,' and thus fails as a matter of law to satisfy the 'actual promise' element of promissory estoppel."[19] Likewise in this case, we have already held the May 30, 2003 letter from Dengel to Bertoson does not constitute unequivocal acceptance of an offer for contract purposes. This letter therefore "fails as a matter of law to satisfy the 'actual promise' element of promissory estoppel."[20]

We also hold that Dengel's alleged oral promises were not sufficiently specific to constitute an "actual promise" for promissory estoppel purposes. Bertoson alleged in an affidavit that at some point during his discussions with Dengel in April and May 2003, Dengel promised him "the City would submit the grant application for the fish meal plant at Sea Hawk's facility in the City's name, and if the State ... awarded the grant, then the City would 'pass through' those funds to Sea Hawk." Bertoson alleged Dengel "reiterated his earlier promise on behalf of the City" after the May 27, 2003 City Council work session, but also "advised that the City had three conditions prior to submitting the Sea Hawk grant application." Three days after this alleged conversation, Dengel sent the May 30 letter outlining Valdez's conditions, informing Sea Hawk these issues would need to be resolved before Valdez accepted the grant funds, and stating the parties would need to enter in to an agreement once the State decided whether to award Valdez the grant. Thus, even assuming Dengel made

---

**13.** Alternatively, Valdez argues Sea Hawk's promissory estoppel claim is barred by its discretionary function immunity under AS 09.65.070(d)(2) and *Ellis v. City of Valdez*, 686 P.2d 700, 705–06 (Alaska 1984), in which we held that a city's decision to spend appropriated funds is generally discretionary absent a legislative mandate directing the city to use the funds to accomplish a specific purpose. Because we hold Sea Hawk's pleadings failed to establish the "actual promise" element of promissory estoppel, we do not reach this alternative argument.

**14.** *Safar v. Wells Fargo Bank, N.A.*, 254 P.3d 1112, 1117 (Alaska 2011) (internal quotation marks omitted).

**15.** *Id.* at 1119 (quoting *Alaska Trademark Shellfish, LLC v. State, Dep't of Fish & Game*, 172 P.3d 764, 767 (Alaska 2007)).

**16.** *Alaska Trademark Shellfish*, 172 P.3d at 767 (quoting *Brady v. State*, 965 P.2d 1, 6, 11 (Alaska 1998)).

**17.** *Valdez Fisheries Dev. Ass'n v. Alyeska Pipeline Serv. Co.*, 45 P.3d 657, 668 (Alaska 2002) (quoting *Brady*, 965 P.2d at 11).

**18.** *Id.* at 668–69.

**19.** *Id.* at 668.

**20.** *Id.*

such promises, he alerted Bertoson that Valdez would not accept the grant unconditionally and then specifically outlined those conditions in the May 30 letter.

Sea Hawk relies on *Zeman v. Lufthansa German Airlines*[21] to argue these alleged oral promises at least create a question of fact regarding whether Valdez made an actual promise to Sea Hawk. In *Zeman* we considered whether letters exchanged between an airline and the owner of an apartment building established mutual assent to enter into a binding contract to lease the owner's building as accommodations for the airline's flight crews.[22] The parties had previously discussed the proposal in detail over dinner, including the number of units needed, cost per unit per month, and the length of the proposed lease.[23] We held the parties' letters were ambiguous and, therefore, must be interpreted in light of the parties' previous

discussions, which raised questions of fact that could not be resolved on summary judgment.[24]

Unlike *Zeman*, where the parties' ambiguous letters had to be interpreted in light of their more detailed verbal discussions regarding terms, conditions, and prices, Dengel's alleged oral promises were general and his letter more specific. These alleged oral promises were not sufficiently "definitive," "clear," and "precise" to constitute an actual promise, particularly when considered in conjunction with the May 30 letter.[25]

 Because Sea Hawk's allegations, even if accepted as true, do not establish that Valdez made an actual promise to Sea Hawk, Valdez was entitled to summary judgment on Sea Hawk's promissory estoppel claim and the superior court should have granted Valdez's summary judgment motion.[26]

---

21. 699 P.2d 1274 (Alaska 1985).

22. *Id.* at 1278–79, 1281.

23. *Id.* at 1278.

24. *Id.* at 1281–82.

25. *Safar v. Wells Fargo Bank, N.A.*, 254 P.3d 1112, 1119 (Alaska 2011) (quoting *Alaska Trademark Shellfish, LLC v. State, Dep't of Fish & Game*, 172 P.3d 764, 767 (Alaska 2007)).

26. In light of our holding that Valdez was entitled to summary judgment on Sea Hawk's promissory estoppel claim, we need not determine whether the superior court abused its discretion in dismissing this claim as a discovery sanction under Civil Rule 37(b). However, we take this opportunity to reiterate that this is an "extreme sanction which should be used only in extreme cases." *Hughes v. Bobich*, 875 P.2d 749, 752 (Alaska 1994). "[A] party should not be barred from his or her day in court where an alternative remedy would suffice to make the adverse party whole." *Sandstrom & Sons, Inc. v. State*, 843 P.2d 645, 647 (Alaska 1992). Therefore, a trial court is required to make several specific findings before imposing litigation-ending sanctions—including a finding that the noncompliant party willfully violated a specific court order—and carefully consider alternative remedies. *See Whittle v. Weber*, 243 P.3d 208, 214 (Alaska 2010). A party's "general abuse of the discovery process" or "broader pattern of discovery abuse" is not an appropriate basis for litigation-ending

sanctions because the party's "attitude in the abstract" is not at issue; rather, the sanctions must be based on a party's violation of a specific discovery order. *See Hughes*, 875 P.2d at 754 n. 5; *Otis Elevator Co. v. Garber*, 820 P.2d 1072, 1074 (Alaska 1991); *see also* Alaska R. Civ. P. 37(b)(2) (allowing a court to impose sanctions when a party "fails to obey an *order* to provide or permit discovery . . . .") (emphasis added).

Here, the superior court's order imposing litigation-ending sanctions did not identify a specific discovery order that Sea Hawk failed to comply with or the discovery materials that Sea Hawk failed to produce. Instead, the court appeared to rely on Sea Hawk's general pattern of discovery abuse, describing the "long and tortured history of discovery issues and problems in this case." Additionally, the court did not analyze the Rule 37(b) factors, instead stating "[f]or the most part the court agrees with the City's assessment of the Rule 37(b)(3) factors," without identifying which parts or factors the court agreed with, and concluding "Sea Hawk willfully failed to provide discovery as alleged." Finally, the order did not adequately address alternative remedies. The court found that with trial scheduled to commence "less than 24 hours from now" it would be "impossible for the City to prepare to meet Sea Hawk's damages claims even if at this very moment Sea Hawk fully complied with all discovery requests." But the court did not consider ordering Sea Hawk to produce the requested expert materials and granting a short continuance to allow Valdez to prepare for trial and depose Sea Hawk's experts again, if necessary. Such a conclusory ruling is

**C. The Superior Court Properly Dismissed Sea Hawk's Claims For Breach Of An Agreement To Negotiate And Breach Of A Duty To Negotiate In Good Faith On Summary Judgment.**

Sea Hawk also contends the superior court erred by dismissing its negotiation claims on summary judgment. In granting Valdez's motion for summary judgment on these issues, the superior court relied on *Valdez Fisheries*[27] and *A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chemical Group, Inc.*[28] to rule: "The linchpin is the Dengel letter of May 30, 2003. This letter is too indefinite to constitute a letter of intent." Sea Hawk argues, as it did in its motion opposing Valdez's summary judgment motion, that the May 30 letter was sufficiently definite to constitute a binding agreement to negotiate and established a duty to negotiate in good faith.

The cases the superior court relied on outline the requirements for establishing an enforceable agreement to negotiate giving rise to a duty to negotiate in good faith. In *Valdez Fisheries*, we considered whether Valdez Fisheries' wildlife rehabilitation center proposal and Alyeska's award letter stating "[w]e intend to begin the process of negotiating a contract as soon as possible" constituted a binding agreement to negotiate.[29] We noted we will enforce agreements to negotiate, but observed "[p]articipation in negotiations ... 'does not necessarily mean that the parties will be able to agree on mutually-acceptable terms.' "[30] Therefore, we will "enforce an agreement to negotiate only if it contains 'a more specific way to resolve ... differences,' such that we are able to discern when the agreement to negotiate has been breached."[31] We then held: "That standard is not met here. At best, the proposal and Alyeska's reply letter are evidence of an agreement to negotiate that fails to spell out a method by which differences are to be resolved."[32]

Similarly, a duty to negotiate in good faith arises out of an agreement to negotiate and is defined by the scope of that agreement. In *Apothekernes*, the Seventh Circuit explained "the purpose and function of a preliminary letter of intent [to negotiate] is not to bind the parties to their ultimate contractual objective" but " 'to provide the initial framework from which the parties might later negotiate a final ... agreement, if the deal works out.' "[33] "The obligation to negotiate in good faith has been generally described as preventing one party from, 'renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.' "[34] However, "the scope of any obligation to negotiate in good faith can only be determined from the framework the parties have established for themselves in their letter of intent [to negotiate]."[35] "In the absence of any agreed upon terms or even a general framework within which to conduct the negotiations, the parties [are] free to insist on or reject any proposed terms to the contract that they wish[ ]."[36]

Consistent with the principles discussed in *Apothekernes*, we considered and rejected a claim for breach of an agreement to negotiate in good faith in *Brady v. State*.[37] We noted "[m]any courts enforce promises to negotiate in good faith," but held the plaintiffs' claim failed because they could "allege

inadequate to support imposing litigation-ending sanctions.

**27.** 45 P.3d 657 (Alaska 2002).

**28.** 873 F.2d 155 (7th Cir.1989).

**29.** *Valdez Fisheries*, 45 P.3d at 663, 667.

**30.** *Id.* at 667 (quoting *Davis v. Dykman*, 938 P.2d 1002, 1008–09 (Alaska 1997)).

**31.** *Id.* (quoting *Davis*, 938 P.2d at 1009).

**32.** *Id.*

**33.** *Apothekernes*, 873 F.2d at 158 (quoting *Runnemede Owners, Inc. v. Crest Mortg. Corp.*, 861 F.2d 1053, 1056 (7th Cir.1988)).

**34.** *Id.* (quoting *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F.Supp. 491, 498 (S.D.N.Y.1987)).

**35.** *Id.* at 159.

**36.** *Id.* (discussing *Feldman v. Allegheny Int'l, Inc.*, 850 F.2d 1217 (7th Cir.1988)).

**37.** 965 P.2d 1 (Alaska 1998).

no broken promise about a specific process of negotiation, for the State made none." [38]

Here, the May 30 letter did not provide the type of framework contemplated in these cases. Even viewing the letter in the light most favorable to Sea Hawk, the parties simply agreed to negotiate an agreement in the future without establishing a specific process of negotiation or a method for resolving disputes. The parties then attempted to negotiate a contract but were unable to reach a final agreement. Based on this letter, we would not be able to discern when the agreement to negotiate was breached. As in *Valdez Fisheries*, this letter is "[a]t best ... evidence of an agreement to negotiate that fails to spell out a method by which differences are to be resolved." [39] Accordingly, we affirm the superior court's dismissal of Sea Hawk's claims for breach of an agreement to negotiate and breach of a duty to negotiate in good faith on summary judgment.[40]

## V. CONCLUSION

We AFFIRM the superior court's orders dismissing Sea Hawk's breach of contract claim under Civil Rule 12(c) and dismissing Sea Hawk's claims for breach of an agreement to negotiate and breach of a duty to negotiate in good faith on summary judgment. We REVERSE the superior court's denial of Valdez's summary judgment motion on Sea Hawk's promissory estoppel claim, and REMAND for the court to enter judgment in favor of Valdez.

WINFREE and CHRISTEN, Justices, not participating.

---

38. *Id.* at 11, 13.

39. *Valdez Fisheries Dev. Ass'n v. Alyeska Pipeline Serv. Co.,* 45 P.3d 657, 667 (Alaska 2002).

40. Sea Hawk also requested that we remand to a different venue and superior court judge, if we remanded this case for trial. Because we do not remand for trial, we do not address those issues.