*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| CYNTHIA L. FERNANDEZ, ) | |
| ) | Supreme Court No. S-14679 |
| Appellant, ) | |
| ) | Superior Court No. 3AN-86-09323 CI |
| v. ) | |
| ) | O P I N I O N |
| DAVID M. FERNANDEZ, ) | |
| ) | No. 6843 – November 22, 2013 |
| Appellee. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, John Suddock, Judge.

Appearances: Cynthia L. Fernandez, pro se, Chugiak, Appellant. David M. Fernandez, pro se, Clam Gulch, Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

STOWERS, Justice.

## I.    INTRODUCTION

Cynthia and David Fernandez married in 1979 and had two children together. In 1986 the parties dissolved their marriage but continued to live together until 1997, when David left their home. David returned in 2001 and lived with Cynthia again until 2007, when the parties separated a second and final time.

In August 2010 David received a letter from the Child Support Services Division (CSSD) advising him that he was required to pay child support in the amount of $450 per month, based on a support order dating from November 1986, when the parties dissolved their marriage. In September 2010 David filed a motion in the superior court requesting "judicial relief from the actions of [CSSD] from seizure of funds." Cynthia opposed the motion. In May 2011 the parties attended a settlement conference conducted by Superior Court Judge John Suddock, in which the parties sought to resolve the child support issue as well as several property division issues. They reached an agreement for Cynthia to pay David $33,000, based on the amount of equity David had contributed to Cynthia's home when they lived together. The parties agreed that Cynthia would attempt to get a second mortgage to fund the settlement. They also agreed that if Cynthia were unable to obtain the full $33,000 from a second mortgage, the parties would "start negotiating on terms in good faith" on a payment plan. They agreed that if they were unable to reach a deal after negotiations, then "all bets are off and they are back to square one."

Cynthia was not able to obtain a second mortgage and immediately sought to return to "square one." The court ordered that she first negotiate terms with David in good faith. After negotiations proved unsuccessful, the court set forth more detailed guidelines for the negotiations. After further unsuccessful negotiations, the court set terms for the settlement, requiring Cynthia to pay David $250 per month, plus her Alaska Permanent Fund Dividend (PFD) each year, until the amount of $33,000 was paid in full.

Cynthia appeals, arguing that the purported settlement agreement became a mere "agreement to negotiate" after she was unable to obtain a second mortgage and that the court lacked authority to set terms and enter a judgment of $33,000 against her. We agree and reverse.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Cynthia and David Fernandez were married in March 1979.  They had two children together, born in 1983 and 1985.  The parties dissolved their marriage in 1986. The dissolution petition provided for a financial allocation of assets and required David to pay $300 per month in child support.  The court approved the terms of the parties' petition and granted a dissolution.  Despite the dissolution of their marriage, the parties remained together in the same household.  In 1987 a house on Thunderbird Drive in Chugiak was purchased in Cynthia's name only, and both parties resided there.  In 1997 the parties separated and David left the house.  David returned in 2001 and again lived with Cynthia at the Thunderbird Drive house.  In 2007 the parties separated for a final time; Cynthia remained in the Thunderbird Drive house, while David departed.

### B.    Proceedings

In August 2010 Cynthia filed an application for services with the Child Support Services Division (CSSD) to update the amount of arrears owed by David. CSSD sent David a letter advising him that he was required to pay child support in the amount of $450 per month, based on the support order dating from November 1986, when the parties dissolved their marriage.[1]  In September 2010 David filed a pro se motion in the superior court seeking "judicial relief from the actions of [CSSD] from seizure of funds and garnishment of pay."  Cynthia filed a pro se opposition in October 2010.

The parties both retained counsel and attended a status hearing in January 2011 before Superior Court Judge John Suddock.  Also present was a representative

---

[1]    This elevated figure accounted for David's principal and interest arrearages due to non-payment.

from CSSD, who stated that CSSD did not have a financial interest in the case and did not need to attend the hearing. Following the hearing Judge Suddock issued an order staying CSSD's enforcement of the child support order, stating that CSSD shall cease action in the case "pending further order of the court."

In February 2011 David filed a Motion to Amend Child Support Arrearage and Equitably Divide Domestic Partnership Property. David argued that he did not owe back child support. He also argued that the parties had entered into a domestic partnership by living together after the dissolution and that the court should equally divide the equity in the assets acquired by the parties during the partnership, including the Thunderbird Drive house. Cynthia filed an opposition to David's motion, contending that support was owed for both children from 1997 to 2003 in the amount of $25,650. With respect to the property division, Cynthia argued that after the dissolution the parties had largely maintained separate finances and that when they separated in 2007 they divided all property; thus, there was "nothing more for the court to do" concerning the property.

In March 2011 the parties' attorneys attended a status hearing before Judge Suddock. Both attorneys agreed that they wanted to have a settlement conference. Although Judge Suddock suggested several other judges who could be available to conduct the conference, David's attorney asked that Judge Suddock do so for the sake of convenience, and Judge Suddock agreed. Cynthia's attorney also agreed to this arrangement.

The settlement conference occurred in May 2011. At the close of the conference the court stated that it would "recite what I believe your settlement is and then either lawyer can correct me or amend." The court summarized the agreed-upon settlement as an agreement "to negotiate for a cash payment from [Cynthia] to [David] based on the fact that there is quite a bit of equity now built up in the Thunderbird

-4-                                                                                    6843

[Drive] house." According to the court, the parties agreed that Cynthia would "go to the bank and try to get a second mortgage to fund a settlement of $33,000," which David would accept "in full and final settlement of all his rights arising out of this relationship." However, the parties also recognized that Cynthia's creditworthiness might not allow her to obtain a $33,000 second mortgage. If Cynthia were not able to obtain the full $33,000 from the bank "she [was] going to negotiate for the highest amount in good faith that she [could] get." The court stated that if Cynthia were able to obtain only $20,000, for example, then there would be a $13,000 deficiency. "At that point the parties are going to start negotiating on terms in good faith." The parties would discuss, for example, if there is "a deal to be made where [David] takes $20,000 plus a $13,000 note for a negotiated duration at a negotiated interest rate." The court stated, "If they can make that deal at that time in light of the circumstances which I can't know at this moment, they have a settlement; if they can't, all bets are off and they are back to square one." The court observed, "I think we all suspect that [Cynthia] may not be able to [get the full $33,000] and there's going to have to be further discussions on terms at that point, and you'll either work that out or you won't." The court also stated that as part of the settlement "the parties determined that no child support is due and that would be part of the order to CSSD." Following the court's recitation of the settlement agreement, both parties affirmed that they assented to the agreement and understood it was binding.

Several months later, in August 2011, Cynthia filed a motion stating that she had "made a good faith and timely effort to obtain a home equity loan without success." She argued that the "agreement . . . stated that if [Cynthia] cannot get funding, that there was no deal and negotiations have to start anew. We are now at that point. It is now time to start over."

In September 2011 the court held a motion hearing. After reviewing the results of the previous settlement conference, the court stated, "I think you have a

binding settlement, you have to negotiate in good faith on a payment plan, and you don't get to your do-over unless you can convince me there is no payment plan you can come up with in good faith." The court asked Cynthia if the parties had begun to negotiate in good faith, and she replied that they had not. The court stated that the parties first would have to negotiate in good faith on a payment plan and, after that, would go back to "square one" only if they were unable to agree on a plan. The court observed that because at the time of the settlement conference Cynthia agreed to refinance her home to obtain $33,000, she must have thought she could absorb an increased mortgage payment somewhere in the area of $300 to $400 per month; the court suggested that range of figures as a starting point for negotiations. The court further stated that "[i]f I became convinced you hadn't negotiated in good faith, I think my next step would just be to impose terms on you."

A week later the court held a telephonic status hearing. David acknowledged that following the previous hearing Cynthia had made several settlement offers. However, he stated that Cynthia's offers were dependent on renegotiating the values of the assets and argued this was contrary to the initial agreement that had fixed the amount Cynthia was to pay David. Cynthia stated that she had made a good faith offer, but acknowledged the offer was based on a revaluation of some of the assets. The court stated that there was nothing that precluded Cynthia from making a settlement offer based on any amount; however, Cynthia was required to negotiate in good faith the terms of the settlement contract, which is "an entirely different and more constrained matter." The court found that the principal amount Cynthia owed David had already been decided ($33,000) and the only variables were interest and the amount of the monthly payment. The court reiterated that the starting point of the negotiations should be the amount Cynthia had envisioned paying each month if she had been able to obtain the second

mortgage.[2]  The court ordered the parties to conduct further negotiations according to these guidelines and stated that if either of the parties failed to negotiate in good faith the court would impose a payment plan.  As the hearing drew to a close, Cynthia argued that according to the initial settlement she was entitled to a "do-over" if they could not agree on a payment.  The court replied that if Cynthia wanted to overturn the settlement agreement she would have to file an Alaska Civil Rule 60 motion for relief from judgment.

Following the hearing the court signed Findings of Fact and Conclusions of Law prepared by David.  The court found that "[t]he parties reached a settlement which was placed on the record," according to which Cynthia was to keep the Thunderbird Drive house and pay David $33,000.  The court also found that the parties agreed "that there is no child support arrearage or any prospective child support owed" by David to Cynthia.  With respect to the terms of the $33,000 payment owed by Cynthia to David, the court found that "[t]his matter remains unresolved at the date of this order, and will be resolved in the future."

In October 2011 Cynthia filed a Rule 60(b) motion requesting that the court set aside the settlement.  She argued that:  (1) Judge Suddock should not have presided over the settlement conference because she had "a clear and strong perception of bias by virtue of the dual role that the court played in this proceeding"; (2) the agreement was not in compliance with the guidelines for maintenance set forth in AS 25.24.160; (3) the child support judgment should not have been removed from the settlement equation; (4)

---

[2]  The court explained that if, for example, Cynthia were to offer only $75 per month, the court would likely find that she had breached her obligation to negotiate in good faith; by contrast, the court would likely find an offer of $500 per month to be a good faith offer.

lack of research regarding valuation adversely affected the negotiation at the settlement conference; and (5) there were errors in the court's findings of fact.

In December 2011 the court held a hearing at which it denied Cynthia's Rule 60(b) motion for relief, finding: (1) in this jurisdiction, judges are permitted to conduct settlement conferences in their own cases, and in this case both parties agreed the court would conduct the settlement conference;[3] (2) the court did not believe Cynthia's claim that she had been intimidated at the settlement conference; and (3) with respect to Cynthia's argument that the settlement was unfair, the court did not see in Cynthia's brief an argument that the case fell under any of the subsections of Rule 60(b).

At that same hearing, the parties further discussed the settlement negotiations. David stated that the parties had been unable to come to an agreement for a reasonable payment plan; he asked that the court establish such a plan. Cynthia responded that she had negotiated in good faith but was unable to pay the $300 to $400 per month suggested by the court; rather, she could afford only a $250 per month payment at most. She requested the court find that good faith efforts had been made and that because her good faith offer of $250 per month had not been accepted, "there is officially no deal." The court stated that the parties should continue to negotiate and that if they could not arrive at a number, the court would "break the tie." David suggested

---

[3]        Canon 3(B)(7)(e) of the Alaska Code of Judicial Conduct states that "[a] judge may, with the consent of the parties, confer separately with the parties and their lawyers in an effort to mediate or settle matters pending before the judge." On October 30, 2006 the Alaska Commission on Judicial Conduct adopted Advisory Opinion 2006-01, which affirms the ability of judges to conduct settlement conferences in their own cases and sets guidelines for such conferences. One of these guidelines provides that "the judge should be aware that recusal may be required if the case fails to settle and the judge has learned information during the conference that might undermine objectivity or create the appearance of impropriety."

that instead of re-negotiating, the court should review Cynthia's DR-250 financial affidavit and determine a fair payment. The court agreed to do so.

In February 2012 the court and the parties conferred in a telephonic hearing. The court stated that it had reviewed Cynthia's DR-250 financial affidavit and had concluded that Cynthia would be required to pay David $250 per month and turn over her PFD to him each year. Cynthia filed a motion for reconsideration from the court's denial of her Rule 60(b) motion. In March 2012 the court signed an Order Granting Judgment and Payment Schedule. The order stated that Cynthia owed David a judgment of $33,000, which would accrue interest at the statutory rate of 3.75% until paid in full. The order also established a payment plan, according to which Cynthia was required to pay David $250 each month until the judgment was paid in full. Further, David was entitled to garnish Cynthia's PFD and apply whatever funds he received to the outstanding balance.

Cynthia appeals from the court's order denying her Rule 60(b) motion and the judgment entered in March 2012. Both parties proceed pro se.

## III. STANDARD OF REVIEW

We "analyze settlement agreements using traditional contract principles."[4] We review the interpretation of a contract de novo.[5] "Whether a party intends to be bound by an agreement is a factual question determined by looking at 'the surrounding facts and circumstances of each case, and is reviewed under the clearly erroneous

---

[4]     *Lewis v. Lewis*, 285 P.3d 273, 275 (Alaska 2012) (citing *Crane v. Crane*, 986 P.2d 881, 885 (Alaska 1999)).

[5]     *Villars v. Villars*, 277 P.3d 763, 768 (Alaska 2012) (citing *Burns v. Burns*, 157 P.3d 1037, 1039 (Alaska 2007)).

standard.' "[6] We will find clear error only when "left with a definite and firm conviction that the trial court has made a mistake."[7]

"A party may seek relief from a final judgment by filing a timely motion under Rule 60 of the Alaska Rules of Civil Procedure."[8] We review denial of a motion for relief from judgment for an abuse of discretion.[9]

## IV. DISCUSSION

### A. The Settlement Agreement Entitled Cynthia To Return To "Square One" After Negotiations Failed.

Cynthia argues that according to the terms of the settlement agreement, in the event that she could not obtain a loan, the parties were to return to "square one" to begin their settlement negotiations anew. She observes that we have held we will enforce "agreements to negotiate" only if they contain " 'a more specific way to resolve . . . differences' such that we are able to discern when the agreement has been breached."[10] Cynthia contends that any "agreement to negotiate" to which the parties might have agreed was unenforceable because the agreement did not provide a "specific way to resolve differences" between them. Finally, she argues that the settlement agreement is unenforceable because the court "added terms" to the agreement to which she did not consent.

---

[6]     *Lewis,* 285 P.3d at 275 (quoting *Juliano v. Angelini*, 708 P.2d 1289, 1291 (Alaska 1985)).

[7]     *Id.* (quoting *Ford v. Ford*, 68 P.3d 1258, 1263 (Alaska 2003)).

[8]     *Powell v. Powell*, 194 P.3d 364, 368 (Alaska 2008).

[9]     *Id.*

[10]     *Valdez Fisheries Dev. Ass'n Inc. v. Alyeska Pipeline Serv. Co.*, 45 P.3d 657, 667 (Alaska 2002) (quoting *Davis v. Dykman*, 938 P.2d 1002, 1008-09 (Alaska 1997)).

David argues that the settlement agreement "meets all requirements of a legally binding contract." He cites precedent stating that Alaska "recognizes a 'strong public policy in favor of the settlement of disputes' "[11] and that settlement agreements "should not be lightly set aside."[12]

### 1. Agreements to negotiate in Alaska law

We have held that "[a]s a general rule, agreements to negotiate are unenforceable because they do not provide a basis for determining the existence of a breach or for giving an appropriate remedy."[13] Although "[i]n theory, an agreement to negotiate is an enforceable contract in the sense that the parties can be made to participate in negotiations,"[14] such participation "does not necessarily mean that the parties will be able to agree to mutually-acceptable terms."[15] Similarly, we have stated that "parties who have merely agreed to negotiate necessarily have retained the ability to say 'no' to the terms proposed by the other party; that means that it is not inevitable that the parties will be able to agree."[16] In short, "an agreement to negotiate is not an agreement to agree."[17]

---

[11] *Colton v. Colton*, 244 P.3d 1121, 1127 (Alaska 2010) (quoting *Mullins v. Oates*, 179 P.3d 930, 937 (Alaska 2008)).

[12] *Id.*

[13] *Davis*, 938 P.2d at 1002, 1008.

[14] *Id.*

[15] *Id.* at 1008-09.

[16] *Id.* at 1009.

[17] *Valdez Fisheries Dev. Ass'n Inc. v. Alyeska Pipeline Serv. Co.*, 45 P.3d 657, 667 (Alaska 2002); *see also Brady v. State*, 965 P.2d 1, 8 (Alaska 1998) (stating that "a
(continued...)

A "duty to negotiate in good faith arises out of an agreement to negotiate."[18] However, the duty to negotiate in good faith "is defined by the scope of [the underlying] agreement."[19] In *Brady v. State*, we considered and rejected a claim for breach of an agreement to negotiate in good faith, holding that the plaintiffs' claim failed because they could "allege no broken promise about a specific process of negotiation, for the State made none."[20] More recently, in *Sea Hawk Seafoods, Inc. v. City of Valdez*, we held that an agreement to negotiate in good faith was unenforceable when "the parties simply agreed to negotiate an agreement in the future without establishing a specific process of negotiation or a method for resolving disputes."[21]

## 2.    The parties' agreement and negotiations

Here the parties agreed that if Cynthia were unable to obtain a $33,000 loan, she would then "negotiate [with her bank] for the highest amount in good faith that she can get" and "[a]t that point the parties will start negotiating on terms in good faith." "If they can make that deal at that time . . . they have a settlement; if they can't, all bets are off and they're back to square one." The parties' agreement did not define "good faith," nor did it spell out "a specific process of negotiation or a method for resolving

---

[17](...continued)
court can never enforce an agreement to negotiate so as to bind one party to the ultimate agreement that the parties sought, but failed, to negotiate").

[18]    *Sea Hawk Seafoods, Inc. v. City of Valdez*, 282 P.3d 359, 368 (Alaska 2012).

[19]    *Id.*

[20]    *Brady*, 965 P.2d at 11, 13.

[21]    282 P.3d at 369.

disputes" if they were unable to agree on a payment plan.[22]  The parties clearly did not agree that the court would determine the terms of the agreement if the parties were unable to do so.  Although the agreement perhaps required Cynthia to "participate in negotiations," it did not require her to make or accept any particular offer.[23]  In other words, Cynthia never relinquished her "ability to say 'no' to the terms proposed by the other party."[24]

Both parties acknowledge that after Cynthia was unable to obtain a second mortgage they subsequently engaged in negotiations that proved unsuccessful.  At that point, if Cynthia had fulfilled her duty to negotiate in good faith under the terms of the parties' agreement, she would have been entitled to start negotiations back at "square one" with "all bets [being] off."  Accordingly, from September to December 2011, Cynthia attempted to return the negotiations back to "square one" several times, but in each instance was prevented from doing so by the court.  At the September 26th hearing, for example, Cynthia stated that according to the initial settlement, she was entitled to a "do-over" if she and David could not agree on a payment.  The court disagreed and stated that Cynthia should file a Rule 60(b) motion if she wanted a "do-over."  At that same hearing, the court set forth "more constrained" guidelines for what it would consider good faith negotiations — setting a range of values that would constitute "good faith" — that were not part of the original agreement.  Similarly in December the court stated that it would "break a tie" if the two parties could not find a meeting point between the two figures — a term that, again, does not appear in the initial agreement.  At that time Cynthia again asserted that she had made a good faith offer, and she argued that

---

[22]     *Id.*

[23]     *See Davis v. Dykman*, 938 P.2d 1002, 1008 (Alaska 1997).

[24]     *See id.* at 1009.

because the offer had not been accepted "there is officially no deal." The court disagreed, again refused to permit Cynthia to return to "square one," and ultimately imposed a payment plan on her.

### 3. Cynthia was entitled to return to "square one."

We conclude that the parties failed to reach a valid settlement agreement that bound Cynthia to any particular course of action after Cynthia was unable to obtain a second mortgage and then engaged in negotiations with David. Cynthia initially agreed that (1) she would attempt to obtain a second mortgage for $33,000 and (2) if she were unable to do so, she would negotiate in good faith on a payment plan. After she was unable to obtain the mortgage, she participated in negotiations with David. Having done so, and in the absence of any express finding that Cynthia had failed to negotiate in "good faith" as that term was contemplated in the original agreement, Cynthia was entitled to start over at "square one" under the terms of the initial agreement. When the court prevented Cynthia from starting over, when the court proceeded to define good faith in narrower terms than the initial agreement had done, and when the court then imposed terms on the parties, the court erroneously interpreted the initial agreement and acted beyond the authority granted to it by that agreement.

### B. Cynthia's Request For Reassignment

In her opening brief on appeal, Cynthia argues that Judge Suddock "should not have sat [that is, served as the deciding judge] on the Rule 60(b) motion" and requests that "if the case need be set for further proceedings, the remand be to a different judge." In Cynthia's reply brief she clarifies that "at this point the issue is not whether the judge should have declined to hear the case after presiding at the settlement conference. Rather, the issue is whether there should be a new assignment on remand."

We have previously addressed a party's request for reassignment on remand in *Deivert v. Oseira*.[25] There the plaintiff argued that on remand the supreme court "should require that the case be assigned to a different judge, invoking [AS 22.20.020(a)(9)], which provides for the disqualification of a judge who cannot give a 'fair and impartial decision.' "[26] We held that the plaintiff's argument was "premature," explaining that the plaintiff had "not sought the removal of [the judge] in the superior court prior to his contention here. He may pursue this question on remand."[27] Similarly, Cynthia's request is premature because she can seek to disqualify the assigned judge on remand pursuant to AS 22.20.020.[28]

## V.    CONCLUSION

For the foregoing reasons, we REVERSE the judgment of the superior court and REMAND for further proceedings.

---

[25]    628 P.2d 575 (Alaska 1981).

[26]    *Id.* at 579.

[27]    *Id.*

[28]    As noted above, Advisory Opinion 2006-1(2) from the Alaska Commission on Judicial Conduct suggests that a settlement judge should consider recusal if a case fails to settle following a settlement conference.