*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| RACHEL L. THOMAS and STEVEN N. THOMAS, husband and wife, | Supreme Court No. S-15372 |
| | Superior Court No. 1KE-10-00613 CI |
| Appellants, | |
| | O P I N I O N |
| v. | |
| | No. 7136 –  December 2, 2016 |
| SARAH B. ARCHER and PEACEHEALTH MEDICAL GROUP d/b/a KETCHIKAN OB/GYN, | |
| | |
| Appellees. | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Ketchikan, William B. Carey, Judge.

Appearances:  C. Keith Stump, Port Angeles, Washington, for Appellants.  Scott J. Gerlach and Donna M. Meyers, Delaney Wiles, Inc., Anchorage, for Appellees.

Before: Stowers, Chief Justice, Winfree, Maassen, and Bolger, Justices.  [Fabe, Justice, not participating.]

MAASSEN, Justice.

## I.    INTRODUCTION

A woman was admitted to a hospital emergency room with pregnancy-related complications.  The attending physician recommended that she be transported by

medivac to a different facility. The woman and her husband informed the physician that they needed their insurer's preauthorization for that course of action or they could be personally liable for the costs. The physician allegedly promised to call the insurer and, if it would not approve the medivac, have the hospital bear the costs itself. But the physician failed to contact the insurer until much later, and the insurer declined coverage.

The couple sued the physician and the hospital, alleging that the physician breached her fiduciary duty by failing to obtain preauthorization as promised; that her promise created an enforceable contract, which was breached; and that if there was no contract the physician's promise should be enforced through the doctrine of promissory estoppel. The superior court granted summary judgment to the physician and hospital. The couple appeals.

We hold that the superior court did not err when it ruled in favor of the physician and hospital on the claims for breach of fiduciary duty and breach of contract, but that genuine issues of material fact precluded summary judgment on the claim for promissory estoppel. We therefore reverse and remand for further proceedings.

## II.   FACTS AND PROCEEDINGS

### A.   Facts

Rachel Thomas was admitted to the emergency room at Ketchikan General Hospital in October 2008 for pregnancy-related complications.[1] She was seen by Dr. Sarah B. Archer, who determined that Rachel was at risk of premature delivery and needed an immediate transfer to a facility better equipped to handle her condition. Because of weather conditions in Anchorage, Dr. Archer recommended that Rachel be medivacked to Swedish Medical Center in Seattle. According to the Thomases, they told

---

[1]     Ketchikan General Hospital is operated by PeaceHealth Medical Group, which also does business as Ketchikan OB/GYN.

Dr. Archer they could not personally afford the medivac and needed preauthorization from the Ketchikan Indian Corporation Tribal Health Clinic (KIC) and the Alaska Native Medical Center (ANMC) before they could be covered for treatment outside of ANMC's Anchorage facilities.[2]  The Thomases allege that Dr. Archer told them "she would contact KIC, not to worry, that everything will be taken care of, and that if KIC didn't cover it 'we' will."  According to the Thomases, they understood "we" to mean the hospital.

In the process of arranging the transfer, Steven Thomas signed an "Acknowledgment of Financial Responsibility," which cautioned that the Guardian Flight medivac charges could be significant.  Though naming KIC as the "Payment Source," Steven agreed to be personally responsible for any unpaid charges and to "save and hold the hospital harmless therefrom."

The Thomases were eventually billed over $23,000 by Swedish Medical Center and over $69,000 by Guardian Flight, the medivac provider.  The Thomases sought payment from KIC and ANMC under their coverage plan but were denied for three stated reasons:  (1) they failed to request preauthorization within 72 hours of beginning treatment or of admission to the healthcare facility; (2) ANMC was "available and accessible to provide the necessary medical services to the patient"; and (3) the Thomases lacked a referral or authorization for the transfer from an ANMC physician. The Thomases admit knowing about the preauthorization requirements and that obtaining preauthorization was ultimately their responsibility; they allege, however, that they boarded the flight based on Dr. Archer's assurances that those requirements would be satisfied by someone else.  Dr. Archer did later write KIC and ANMC to explain her

---

[2]  KIC acts as an agent for the Thomases' insurer, Contract Health Services (CHS).

decision to have Rachel transported to Seattle, but not until May 2009, over six months after the transfer.

### B.    Proceedings

In 2010 the Thomases filed suit against the hospital and Dr. Archer (collectively "the hospital")[3] alleging breach of fiduciary duty, breach of contract, promissory estoppel,[4] and negligent or intentional infliction of emotional distress. The claims were all based on Dr. Archer's alleged promise to contact the Thomases' insurance providers and ensure coverage for the expenses related to Rachel's transport to and treatment in Seattle. The superior court granted summary judgment to the hospital on the Thomases' fiduciary duty claim, agreeing with the hospital's argument that a physician's fiduciary duty is limited to the context of medical treatment. The court later granted summary judgment to the hospital on the remaining claims, holding that the facts as alleged did not create an enforceable contract and that there was no actual promise to the Thomases or substantial change in position by the Thomases sufficient to support their promissory estoppel claim. The court also dismissed the claims for negligent and intentional infliction of emotional distress, noting that the Thomases had agreed to withdraw them, although they had not yet done so, and had produced no evidence or legal authority to support the claims.[5]

---

[3]    The hospital and the physician shared the same counsel and the same litigation position on all issues.

[4]    The Thomases did not articulate a promissory estoppel claim as such until they filed their opposition to the hospital's motion for summary judgment on the breach of contract claim. The superior court nonetheless considered the promissory estoppel claim as consistent with the Thomases' other claims.

[5]    The Thomases also withdrew their claim for the costs of the Guardian Flight after confirming they had a separate insurance plan that covered the medivac.
(continued...)

The hospital moved for attorney's fees as the prevailing party, supporting its motion with an affidavit that summarized its fees and offering to file itemized billing records under seal for in camera review. The Thomases opposed the motion. The superior court ordered the hospital to submit its billings for in camera review but did not require that they be shared with the Thomases. Following in camera review, the court awarded the hospital approximately $25,000 in attorney's fees (20% of the total billings) and over $6,000 in costs. This appeal followed.

## III.    STANDARD OF REVIEW

"We review grants of summary judgment de novo."[6] "We 'will affirm a grant of summary judgment if the evidence in the record presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.' "[7]

Whether there is a fiduciary duty and whether promissory estoppel applies are both questions of law to which we apply our "independent judgment, adopting the rule of law that is most persuasive in light of precedent, reason, and policy."[8]

---

[5](...continued)
Thus, only the expenses of treatment at Swedish Medical Center remain at issue.

[6]    *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 516 (Alaska 2014) (citing *Hurn v. Greenway*, 293 P.3d 480, 483 (Alaska 2013)).

[7]    *Copper River Sch. Dist. v. Traw*, 9 P.3d 280, 283 (Alaska 2000) (quoting *Davis v. Dykman*, 938 P.2d 1002, 1006 (Alaska 1997)).

[8]    *Beal v. McGuire*, 216 P.3d 1154, 1162 (Alaska 2009) (citing *K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 724 n.66 (Alaska 2003)) (fiduciary duty); *Ross v. State, Dep't of Revenue*, 292 P.3d 906, 909 (Alaska 2012) (citing *Hidden Heights Assisted Living, Inc. v. State, Dep't of Health & Soc. Servs., Div. of Health Care Servs.*, 222 P.3d 258, 268 (Alaska 2009)) (promissory estoppel).

## IV. DISCUSSION

The Thomases argue three substantive points on appeal: (1) that the superior court erred by deciding that Dr. Archer did not owe the Thomases a fiduciary duty to contact KIC for authorization after having promised to do so; (2) that the superior court erred by deciding on summary judgment that the parties' words and actions did not create an enforceable contract; and (3) that the superior court erred by rejecting promissory estoppel as a basis for enforcement of Dr. Archer's alleged promise to the Thomases.[9]

"Alaska Civil Rule 56 provides for judgment to be granted to a party where 'there is no genuine issue as to any material fact' and 'the moving party is entitled to judgment as a matter of law.' "[10] "[A] party seeking summary judgment has the initial burden of proving, through admissible evidence, that there are no disputed issues of material fact and that [it] is entitled to judgment as a matter of law."[11] "Once the moving party has made that showing, the burden shifts to the non-moving party 'to set forth specific facts showing that he could produce evidence reasonably tending to dispute or contradict the movant's evidence and thus demonstrate that a material issue of fact exists.' "[12] The court "draw[s] all reasonable inferences in favor of the non[-]moving

---

[9] The Thomases also appeal the superior court's award of attorney's fees and argue they should be awarded the costs and fees associated with appeal, but we do not find it necessary to reach these issues.

[10] *Christensen*, 335 P.3d at 517 (quoting Alaska R. Civ. P. 56(c)).

[11] *Mitchell v. Teck Cominco Alaska Inc.*, 193 P.3d 751, 760 n.25 (Alaska 2008) (citing *Shade v. Co & Anglo Alaska Serv. Corp.*, 901 P.2d 434, 437 (Alaska 1995)).

[12] *Christensen*, 335 P.3d at 517 (quoting *State, Dep't of Highways v. Green*, 586 P.2d 595, 606 n.32 (Alaska 1978)).

party."[13] "We require only that the evidence proposed for trial must not be based entirely on 'unsupported assumptions and speculation' and must not be 'too incredible to be believed by reasonable minds.' "[14] "After the court makes reasonable inferences from the evidence in favor of the non-moving party, summary judgment is appropriate only when no reasonable person could discern a genuine factual dispute on a material issue."[15]

Accordingly, for purposes of our review of the superior court's decision on summary judgment, we assume that Dr. Archer made the statement, as described by the Thomases, "that she would contact KIC, not to worry, that everything will be taken care of, and that if KIC didn't cover it 'we' will."

## A. The Superior Court Did Not Err By Granting Summary Judgment To The Hospital On The Thomases' Fiduciary Duty Claim.

The Thomases first argue that the superior court erred by granting summary judgment on the Thomases' claim that Dr. Archer "owed a fiduciary duty to [the] Thomases to contact KIC for authorization as she promised." The superior court noted in its order that "the parties do not dispute the existence of a fiduciary relationship, only the scope of the duties that relationship imposes." The court cited two Alaska cases discussing fiduciary duties[16] and relied heavily upon an unpublished Ohio decision with facts and arguments similar to those here, *Northern Ohio Medical Specialists, LLC v.*

---

[13] *Greywolf v. Carroll*, 151 P.3d 1234, 1240 (Alaska 2007).

[14] *Christensen*, 335 P.3d at 520 (first quoting *Peterson v. State, Dep't of Nat. Res.*, 236 P.3d 355, 367 (Alaska 2010); then quoting *Wilson v. Pollet*, 416 P.2d 381, 384 (Alaska 1966)).

[15] *Id.* (internal citations omitted).

[16] *Pedersen v. Zielski*, 822 P.2d 903 (Alaska 1991); *Greater Area Inc. v. Bookman*, 657 P.2d 828 (Alaska 1982).

*Huston.*[17] These precedents, the superior court decided, "indicate that the duties imposed by the physician-patient fiduciary relationship should be kept to matters involving medical treatment and advice, which are not at issue here." The court observed that the fiduciary relationship could nonetheless be relevant to the Thomases' promissory estoppel claim as evidence of the reasonableness of their reliance on what the doctor told them.

We discussed the scope of a physician-patient fiduciary duty in *Pedersen v. Zielski.*[18] The plaintiff brought a malpractice action against a hospital and the surgeons who operated on him following a car accident; the trial court ruled that the action was barred by the statute of limitations.[19] We reversed, holding that there were genuine issues of material fact as to whether the plaintiff's doctor should be estopped from relying on the statute of limitations when he failed to disclose to the patient that a likely cause of his permanent paralysis was the surgery rather than the underlying accident.[20] Of importance here, we explained why the physician-patient relationship gives rise to a fiduciary duty of full disclosure:

> The physician-patient relationship is one of trust. *Because the patient lacks the physician's expertise, the patient must rely on the physician for virtually all information about the patient's treatment and health.* A physician therefore undertakes[] not only to treat a patient physically, but also to respond fully to a patient's inquiry about his treatment, i.e.,

---

[17] No. E-09-13, 2009 WL 3683632 (Ohio App. Nov. 6, 2009).

[18] 822 P.2d at 909.

[19] *Id.* at 905.

[20] *Id.* at 905, 908-09.

to tell the patient everything that a reasonable person would want to know *about the treatment*.[21]

In *Northern Ohio Medical Specialists*, the plaintiff, whose case had been dismissed on the pleadings, argued on appeal that he had pleaded "sufficient, operative facts to support recovery under his claims that a doctor, . . . [has] a fiduciary duty to submit claims to an insurance company when he promises to do so."[22] The Ohio appellate court recognized that a fiduciary duty is "[a] duty to act for someone else's benefit, while subordinating one's personal interests to that of the other person."[23] But the court held that while "[a] physician undisputedly owes a fiduciary duty to his or her patient with respect to diagnosing and treating diseases and injuries," no such "duty extends beyond the medical relationship"; accordingly, the physician's fiduciary duties did not include submitting insurance claims after promising to do so.[24]

This reasoning is consistent with our description of the physician's fiduciary duty in *Pedersen*. A physician's expertise in the practice of medicine is unique, respected, and highly valued. The patient, lacking that expertise, relies on the physician's judgment and care and is especially vulnerable to the physician's mistakes;

---

[21] *Id.* at 909 (emphasis added; original emphasis omitted); *see also Carson v. Fine*, 867 P.2d 610, 617 (Wash. 1994) (en banc) ("The [physician-patient fiduciary] relationship is predicated on the proposition that the physician has special knowledge and skill in diagnosing and treating diseases and injuries and that the patient has sought and obtained the services of the physician because of this expertise." (first citing 70 C.J.S. *Physicians and Surgeons* § 58 (1987); then citing 61 AM. JUR. 2D, *Physicians, Surgeons and Other Healers* § 167 (1981))).

[22] 2009 WL 3683632, at *1.

[23] *Id.* at *2 (alteration in original) (quoting *Fiduciary Duty,* BLACK'S LAW DICTIONARY (6th ed. 1990)).

[24] *Id.* (citing *Tracy v. Merrell Dow Pharm., Inc.*, 569 N.E.2d 875, 878-79 (Ohio 1991)).

the law protects the patient's vulnerability by imposing on the physician a heightened duty of care *when the physician is acting within the scope of that expertise*.[25]

At the heart of this case are two different statements attributed to Dr. Archer. The first and undisputed one is her recommendation that Rachel be immediately transported by medivac to a hospital that was better equipped to treat her pregnancy-related complications. The second is Dr. Archer's alleged promise that she would obtain preauthorization for the transport costs from the Thomases' insurance providers and that the costs would otherwise be covered by the hospital. The first recommendation is plainly within the scope of Dr. Archer's fiduciary duty; determining whether a transport was necessary was a matter of medical expertise on which the Thomases had little choice but to rely. The alleged promise regarding insurance and payment, on the other hand, did not stem from Dr. Archer's special expertise as a physician. The Thomases themselves knew about the preauthorization procedure, having followed it already that evening when Rachel was admitted to the emergency room. The Thomases did not need Dr. Archer's special expertise in order to understand the requirements of their insurance coverage and to obtain the required preauthorization.

Because the physician-patient fiduciary duty exists to protect the vulnerable patient relying on the physician's special expertise in medicine, a physician's promise

---

[25]     *See, e.g.*, *Brown v. Wells Fargo Bank, NA*, 85 Cal. Rptr. 3d 817, 835 (Cal. App. 2008) ("Fiduciary obligations 'generally come into play when one party's vulnerability is so substantial as to give rise to equitable concerns underlying the protection afforded by the law governing fiduciaries.' " (quoting *City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 181 P.3d 142, 152 (Cal. 2008))); Dayna Bowen Matthew, *Defeating Health Disparities — A Property Interest Under the Patient Protection and Affordable Care Act of 2010*, 113 W. VA. L. REV. 31, 38 (2010) ("[I]n the physician-patient relationship, superior expertise, knowledge, and skill place doctors in the position of fiduciaries, and the dependent vulnerability of patients in their care are the beneficiaries [sic].").

to obtain preauthorization of medical treatment for purposes of insurance coverage is outside the scope of the physician's fiduciary duty. The superior court did not err when it granted summary judgment to the hospital on the Thomases' breach of fiduciary duty claim.[26]

### B. The Superior Court Did Not Err By Granting Summary Judgment To The Hospital On The Thomases' Breach Of Contract Claims.

The Thomases also challenge the superior court's conclusion on summary judgment that Dr. Archer's alleged promise about insurance and payment did not give rise to an enforceable contract. The court decided that "[t]he most apparent shortcoming of the alleged contract is the lack of consideration" because in response to Dr. Archer's alleged promise the Thomases "made no return promise, and [the hospital] sought none."[27] The court rejected the Thomases' contentions that return consideration could be found in either (1) the detriment to them when they failed to get preauthorization or

---

[26] We also reject the Thomases' argument that Dr. Archer's statements expanded the scope of what in normal circumstances would be the ordinary physician-patient fiduciary duty limited to medical matters. If Dr. Archer's promise to obtain preauthorization created a duty to act, it was not a duty based on her special expertise as a physician.

The Thomases also argue, most extensively in their reply brief, that by making the alleged promise Dr. Archer agreed to act as their agent, thus creating another type of fiduciary duty. But the Thomases did not advance an agency theory in the superior court, instead focusing exclusively on the fiduciary duty inherent in the physician-patient relationship. "It is well established that matters not raised at trial will not be considered on appeal." *Doyle v. Doyle*, 815 P.2d 366, 372 (Alaska 1991) (quoting *Brooks v. Brooks*, 733 P.2d 1044, 1053 (Alaska 1987)).

[27] "The formation of an express contract requires an offer encompassing its essential terms, an unequivocal acceptance of the terms by the offeree, consideration[,] and an intent to be bound." *Municipality of Anchorage v. Stenseth*, 361 P.3d 898, 906 (Alaska 2015) (alteration in original) (quoting *Childs v. Kalgin Island Lodge*, 779 P.2d 310, 314 (Alaska 1989)).

(2) the benefit to the hospital when the medivac to Seattle relieved it of the responsibility of caring for Rachel and the risk that she would lose her unborn child while in the hospital's care. We agree with the court's conclusion that the alleged contract failed for lack of consideration.

"We have held that '[t]o constitute consideration, a performance or a return promise must be bargained for. . . . A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise.' "[28] As the superior court reasoned, there is no evidence that the hospital sought a detriment to the Thomases as consideration for Dr. Archer's alleged promise. While the Thomases' failure to obtain preauthorization is relevant to their claim for promissory estoppel, discussed below, it does not constitute bargained-for consideration.

As for the benefit to the hospital conferred by Rachel's departure, there is no evidence this benefit was bargained for either. It is undisputed that the hospital did not have the capability to manage Rachel's medical needs and that she had to be transported somewhere else. Rachel testified that she would have followed Dr. Archer's medivac recommendation regardless of whether there was insurance coverage for it: "[M]y concern was not billing at that time. It was immediate health." Thus, even assuming that the Thomases' departure conferred a benefit on the hospital, the hospital received no benefit *in exchange for* Dr. Archer's alleged promise; relying on Dr. Archer's medical advice, the Thomases were going to leave anyway.

---

[28]     *Askinuk Corp. v. Lower Yukon Sch. Dist.*, 214 P.3d 259, 267 (Alaska 2009) (alterations in original) (quoting *Reust v. Alaska Petrol. Contractors, Inc.*, 127 P.3d 807, 811 n.4 (Alaska 2005)); *see also Baker v. Ryan Air, Inc.*, 345 P.3d 101, 110 n.23 (Alaska 2015) ("To constitute consideration, a performance or a return promise must be bargained for." (quoting RESTATEMENT (SECOND) OF CONTRACTS § 71(1) (AM. LAW INST. 1981))).

Because we agree with the superior court's conclusion that the alleged contract lacked the essential element of consideration, we do not address the other elements required for the formation of an enforceable contract. The superior court did not err by granting summary judgment on the breach of contract claim.

**C.   It Was Error To Grant Summary Judgment On The Thomases' Promissory Estoppel Claim.**

The Thomases next argue that the superior court erred when it rejected their claim that "[i]f the parties did not create a binding contract, their agreement is nevertheless enforceable by the doctrine of promissory estoppel." They argue that Dr. Archer's alleged promise induced them to leave the hospital immediately without their insurer's preauthorization, that this was a foreseeable response to the promise, that because they left the hospital without preauthorization they incurred substantial medical expenses, and that the interest of justice is served by enforcing Dr. Archer's promise. They argue that, at a minimum, a jury should have decided this claim.

"The doctrine of promissory estoppel allows the enforcement of contract-like promises despite a technical defect or defense that would otherwise make the promise unenforceable."[29]  Promissory estoppel has these elements: "1) [t]he action induced amounts to a substantial change of position; 2) it was either actually foreseen or reasonably foreseeable by the promisor; 3) an actual promise was made and itself induced the action or forbearance in reliance thereon; and 4) enforcement is necessary in the interest of justice."[30]  The superior court, relying primarily on *Sea Hawk Seafoods,*

---

[29]    *Kiernan v. Creech*, 268 P.3d 312, 315 (Alaska 2012).

[30]    *Simpson v. Murkowski*, 129 P.3d 435, 440 (Alaska 2006) (quoting *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1284 (Alaska 1985)); *see also Dick Fischer Dev. No. 2, Inc. v. Dep't of Admin.*, 838 P.2d 263, 268 (Alaska 1992) ("A promise which the promisor should reasonably expect to induce action or forbearance
(continued...)

*Inc. v. City of Valdez*,[31] held that Dr. Archer's "alleged promise [was] not 'definitive,' 'clear,' or 'precise' " enough to constitute an "actual promise." The court discussed what it perceived to be "the lack of clarity in the alleged oral promises and the lack of unequivocal acceptance," noting "[Steven's] signature on the Acknowledgment of Financial Responsibility and [Rachel's] deposition testimony that . . . she would have taken the flight to Swedish even if it was not covered." The court concluded that even if all other elements of promissory estoppel were met, the Thomases "fail to show a substantial change in position" because of Rachel's testimony that she "would have gone to Swedish even if she knew the [medivac] would not be covered."

We conclude that there are genuine issues of material fact about whether the elements of the doctrine were met. It was therefore error to grant summary judgment on the Thomases' promissory estoppel claim.

### 1. Whether there was a substantial change of position

"Whether particular actions represent substantial changes [in position] is a question of all the circumstances and is not determinable by reference to a set formula."[32] Courts tend to "look for evidence of actual and substantial economic loss."[33]

---

[30](...continued) on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." (quoting RESTATEMENT (SECOND) OF CONTRACTS § 90(1) (AM. LAW INST. 1981))).

[31] 282 P.3d 359 (Alaska 2012).

[32] *Zeman*, 699 P.2d at 1284 (citing 1A A. CORBIN, CORBIN ON CONTRACTS § 200, at 216 (1963)).

[33] *Id.* (first citing *Weiner v. Romley*, 381 P.2d 581, 583-84 (Ariz. 1963); then citing *Brand S Corp. v. King*, 639 P.2d 429 (Idaho 1981)).

In deciding that the "substantial change in position" element was not met, the superior court relied on the Thomases' concession that they would have followed Dr. Archer's advice regardless of whether they had insurance coverage. Rachel testified at her deposition that "[a]t this point, [she] would have gone anywhere to save [her unborn] son's life." She continued: "I mean, had [Dr. Archer] said you need to go to Anchorage, I would have gone to Anchorage. She said, you need to go to Seattle, so I am going to Seattle." When asked whether she would have agreed to be transported to Seattle "if [she] felt that it would have saved [her] son's life" even if there was no insurance coverage for it, she responded, "Again, my concern was not billing at that time. It was immediate health." This testimony, the superior court concluded, demonstrated that the Thomases did not substantially change their position based on Dr. Archer's alleged promise.

But while there is no dispute that the Thomases would have flown to Seattle regardless of insurance coverage, questions of fact remain because of their assertions that they would have called their insurance providers for preauthorization had they not believed that Dr. Archer was going to do so. A reasonable person could conclude that the Thomases substantially changed their position in reliance upon Dr. Archer's alleged promise by failing to do what they otherwise would have done.

## 2. Whether the change in position was foreseeable

"According to Corbin on Contracts, '[f]oreseeability of reliance raises a question of fact for court and jury.' "[34] The superior court did not address the foreseeability prong in its order on summary judgment, nor does the hospital address it on appeal, focusing its analysis instead on the elements of changed position and actual

---

[34] *Simpson*, 129 P.3d at 441 (alteration in original) (quoting CORBIN ON CONTRACTS, *supra* note 32, at 216).

promise. We conclude that a reasonable person, when viewing the circumstances of Dr. Archer's alleged promise — including that it was made by a treating physician in the context of a medical emergency — could find it was reasonably foreseeable that the Thomases would rely on the promise and not seek preauthorization themselves.

### 3.    Whether there was an actual promise

The superior court's rejection of the Thomases' promissory estoppel claim rested primarily on its conclusion that there was no "actual promise" on which the Thomases were entitled to rely. "When a promissory estoppel claim is made in conjunction with a breach of contract claim, the 'actual promise' element of promissory estoppel is 'analytically identical to' the ' "acceptance" required for a contract.' "[35] "Were it otherwise, promissory estoppel . . . would become a device by which parties could be held to contracts they did not accept."[36] "An 'actual promise' is one that is 'definitive, . . . very clear, . . . and must use precise language.' "[37] "[A] promise . . . must 'manifest an unequivocal intent to be bound.' "[38]

The superior court, in deciding that there was no actual promise, relied on *Sea Hawk Seafoods, Inc. v. City of Valdez*, in which we reversed the trial court's denial of summary judgment to Valdez on Sea Hawk's promissory estoppel claim.[39] Valdez

---

[35]    *Valdez Fisheries Dev. Ass'n v. Alyeska Pipeline Serv. Co.*, 45 P.3d 657, 668 (Alaska 2002) (quoting *Brady v. State*, 965 P.2d 1, 11 (Alaska 1998)).

[36]    *Id.*

[37]    *Safar v. Wells Fargo Bank, N.A.*, 254 P.3d 1112, 1119 (Alaska 2011) (alterations in original) (quoting *Alaska Trademark Shellfish, LLC v. State, Dep't of Fish & Game*, 172 P.3d 764, 767 (Alaska 2007)).

[38]    *Id.* (quoting *Alaska Trademark Shellfish*, 172 P.3d at 767).

[39]    282 P.3d 359, 361-62 (Alaska 2012).

had made oral promises to Sea Hawk that it would submit a grant application for funds, which it would then turn over to Sea Hawk to pay for the conversion of one of Sea Hawk's processing facilities.[40] Valdez confirmed these promises in a letter, indicating that it was in the process of finalizing the application but that a number of issues remained to be resolved before it would accept the grant.[41] After the grant application was tentatively approved, Valdez sent Sea Hawk another letter reiterating that it would not accept the grant until it had reached an agreement with Sea Hawk.[42] The parties could not agree and Valdez did not accept the grant, prompting Sea Hawk's suit.[43]

The superior court in this case noted our holding in *Sea Hawk* that Valdez's "alleged oral promises were not sufficiently 'definitive,' 'clear,' and 'precise' to constitute an actual promise, particularly when considered in conjunction with [Valdez's] letter."[44] The court reasoned that because "[t]he language of [Valdez's] alleged promises [in *Sea Hawk*] . . . was more certain than in the present case," Dr. Archer's alleged promises could not be considered precise enough to constitute an actual promise.

We do not consider *Sea Hawk* controlling. Valdez's oral offer in *Sea Hawk* identified "three conditions prior to submitting the Sea Hawk grant application," and its later confirming letter again noted those "conditions, informing Sea Hawk these issues would need to be resolved before Valdez accepted the grant funds, and stating the parties would need to enter [into] an agreement once the State decided whether to award Valdez

---

[40]    *Id.* at 362.

[41]    *Id.*

[42]    *Id.* at 363.

[43]    *Id.* at 361, 363.

[44]    *Id.* at 367.

the grant."[45]  We therefore held that "even assuming [Valdez] made such promises, [it] alerted [Sea Hawk] that Valdez would not accept the grant *unconditionally* and then specifically outlined those conditions in the [confirming] letter."[46]  The promises in that case instead "demonstrate[d] [that] Valdez contemplated entering into a future agreement with Sea Hawk addressing various issues."[47]

The alleged promise at issue in this case, unlike the promises in *Sea Hawk*, was not expressly conditional.  As the Thomases describe Dr. Archer's promise, it gave no indication that it depended on the outcome of future negotiations.  The alleged promise defined Dr. Archer's role — she would contact the insurers if the Thomases boarded the medivac plane immediately — and it defined the Thomases' role — they would board the plane without taking time to contact their insurers.  Because the evidence could support a conclusion that the Thomases unequivocally accepted a clear offer, a reasonable person could conclude that there was an "actual promise."[48]

### 4. Whether enforcement of the promise is necessary in the interest of justice

"The fourth requirement, that enforcement is necessary in the interest of justice, presents fact questions that ordinarily should not be decided on summary

---

[45]     *Id.* at 366.

[46]     *Id.* at 366-67 (emphasis added).

[47]     *Id.* at 365.

[48]     The superior court relied on Steven's signing of the Acknowledgment of Financial Responsibility as evidence that the Thomases were willing to assume personal liability for Rachel's treatment.  But this evidence is subject to different interpretations considering the emergency circumstances and Steven's designation of KIC as the "payment source," which is consistent with the Thomases' claim that they were relying on Dr. Archer to contact their insurers.

judgment."[49]  This is a fact-intensive analysis in which reasonable people could reach different conclusions.

Because the Thomases identified issues of fact that precluded summary judgment, it was error to grant the hospital's motion on the Thomases' promissory estoppel claim.

## V.    CONCLUSION

We AFFIRM the superior court's grant of summary judgment on the Thomases' fiduciary duty and breach of contract claims.  We REVERSE the superior court's grant of summary judgment on the Thomases' promissory estoppel claim and REMAND for further proceedings consistent with this opinion.  The award of attorney's fees to the defendants as prevailing parties is accordingly VACATED.[50]

---

[49]    *Reeves v. Alyeska Pipeline Serv. Co.*, 926 P.2d 1130, 1142 (Alaska 1996) (citing *State v. First Nat'l Bank of Ketchikan*, 629 P.2d 78, 82 n.4 (Alaska 1981)).

[50]    Though we vacate the attorney's fees award, we note our concern with the superior court's award of attorney's fees to the hospital following in camera review of itemized billing records that were not made available to the Thomases.  We have held that "where the rule authorizes reasonable actual fees, a court may not award attorney's fees to a party who has not itemized his or her requested fees, when the opposing party has requested such itemization." *Roderer v. Dash*, 233 P.3d 1101, 1113 (Alaska 2010) (quoting *Marron v. Stromstad*, 123 P.3d 992, 1014 (Alaska 2005)).  The reasonableness requirement of Alaska Civil Rule 82 is best met by allowing a party who may be ordered to pay attorney's fees to review the other party's time and billing records.